Commonwealth v. Cormier.

## Commonwealth *vs.* James L. Cormier.

Worcester. April 7, 1998. - May 14, 1998.

Present: Wilkins, C.J., Abrams, Lynch, Fried, & Marshall, JJ.

*Evidence,* Prior misconduct, State of mind, Relevancy and materiality. *Practice, Criminal,* Assistance of counsel, Argument by prosecutor, Instructions to jury, Deliberation of jury, Capital case. *Homicide. Intoxication. Malice. Jury and Jurors.*

At a murder trial, the judge properly denied the defendant's motion to exclude evidence of several incidents in which the defendant physically attacked the victim, threatened her, or expressed to a third party his desire to kill her, where such evidence was directly relevant to the defendant's possible motive and intent in killing the victim and his claim of self-defense, and where the judge's limiting instructions reduced the possible prejudicial effect of the evidence. [449-450]

A criminal defendant failed to demonstrate ineffective assistance of his trial counsel in deciding not to present expert testimony at trial concerning the defendant's intoxication and alcohol problems, where it was likely that such testimony would not have been helpful to the defendant. [450-451]

Error, if any, in the prosecutor's closing argument in his description of the defendant's weight did not create a substantial likelihood of a miscarriage of justice. [451-452]

At the trial of an indictment for murder in the first degree by reason of extreme atrocity or cruelty, the judge correctly instructed the jury on their consideration of the effects of intoxication on the defendant's state of mind at the time of the murder [452], and the judge's erroneous initial instruction to the jury, defining the third prong of malice by reference to "grievous bodily harm," did not create a substantial likelihood of a miscarriage of justice, where the judge took prompt and forceful action to correct the mistake less than one hour after the jury retired to deliberate [452-453].

In a murder case, the actions of the jury, on the second day of deliberations, in discussing the case while all jurors were present but before the official start of deliberations that morning, did not warrant a new trial, where the defendant failed to show or even to allege that the jury had been exposed to extraneous influences. [453]

Indictment found and returned in the Superior Court Department on April 13, 1994.

The case was tried before *Elizabeth Butler,* J.

*Russell C. Sobelman* for the defendant.

*Christopher P. Hodgens*, Assistant District Attorney, for the Commonwealth.

FRIED, J. The defendant, James L. Cormier, was convicted of murder in the first degree committed with extreme atrocity or cruelty. He brings a number of challenges to the conviction: (1) the judge committed reversible error in denying the defendant's motion in limine to exclude evidence of prior bad acts; (2) the defendant was denied the effective assistance of counsel because his trial counsel failed to offer psychological evidence relevant to issues of capacity and malice; (3) the prosecutor committed a reversible error in mischaracterizing the defendant's physical attributes in his closing remarks; (4) the judge failed to instruct the jury correctly on the relevance of intoxication on the defendant's state of mind; (5) the judge erred in instructing the jury on malice aforethought; and (6) the defendant's right to a fair trial was undermined by the jury's unauthorized out-of-court deliberation. We affirm the conviction and decline to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the verdict.

I

Some time between 9 and 10 P.M. on December 27, 1993, the defendant went to the home of the victim, his estranged wife. He and the victim soon got into an argument concerning the whereabouts of a necklace. The victim, thinking that the defendant had the necklace, threatened him with a steak knife. The victim's daughter from a previous marriage found the necklace in the victim's bedroom.

After the daughter was sent to her room, the defendant and the victim went to the cellar where their argument continued. Minutes later, the daughter and the victim's son from a previous marriage heard the defendant cry out, "Why did you make me have to do this?" After the back door slammed, the victim called to her children in a faint voice. Both children rushed to their mother's aid. They saw their mother lying in a pool of blood, on the kitchen floor. The son tried to call 911, but the telephone line was dead. He then ran to a neighbor's house for help.

Meanwhile, the defendant appeared at neighboring homes. He banged on the door of the Rozevicius house, but was refused entry. With blood all over his hands and clothes, he came bursting into the Ashworth home. He cried out: "Call 911. I just

stabbed my fucking wife. Call 911. I stabbed my fucking wife."
After placing the call himself, the defendant walked away.

The son too sought help at the Rozevicius home, and Denise
Rozevicius returned with him to the victim's house to discover
the victim lying in a pool of blood on the kitchen floor. The
victim was conscious with blood gushing from her abdomen.
The son locked the kitchen door.

When the defendant came back, and the son refused to unlock
the door, the defendant kicked the door open. Denise Rozevi-
cius had difficulty locating all of the victim's wounds because
of the amount of blood. She asked the defendant "where else
he had stabbed her." The defendant immediately pointed to the
stab wound under the victim's left arm. Looking at the victim,
the defendant asked her why she "made him do this." The
victim then lost consciousness. She died shortly thereafter as a
result of stab wounds to her chest and abdomen, the most
significant of which penetrated her heart. She had also suffered
"defensive-type wounds" to various parts of her body.

A police officer soon entered the kitchen and asked Denise
Rozevicius who had stabbed the victim. She responded, "Jim."
The defendant admitted that he had stabbed his wife. A second
officer arrived, advised the defendant of his Miranda rights, and
removed from the defendant's rear pocket a folding knife
covered with blood and hair.

At the police station, the defendant waived his Miranda rights
and gave a statement. The defendant said he stabbed the victim
in self-defense. The victim had a knife in her hand and he
wrested it away from her. At that point, the defendant stated, he
"lost it," and stabbed the victim once in the front, and stabbed
her again in the side as she was going down. He then began
cutting telephone wires. The defendant recounted that the victim
pleaded with him to help her, and he sought help from her
neighbors. The defendant offered a second statement after
another waiver of Miranda rights. He said that the victim lunged
at him with a knife, and he wrested it from her. Then,

> "I just snapped and hit her with it. It was not intentional
> that I stabbed her . . . . She was falling, and I stabbed her
> again. Then I cut the phone wires, because I didn't know
> what to do. I was scared."

The defendant, who has had a long history of alcohol abuse,
testified that he had spent the Christmas day preceding the day

of the murder drunk, was not drunk but "close to it" the next day, and "was under the influence, [but] not drunk" on December 27, the day of the murder.

## II

### A

The judge denied the defendant's motion in limine seeking to exclude evidence of several incidents in which the defendant physically attacked the victim, threatened her, or expressed to a third party his desire to kill her. All the incidents allegedly occurred in 1993. In March of that year, after the victim punched the defendant three times, the defendant choked her, punched her face, threw her into the living room, and yanked out a "handful of hair." In the summer, after getting a telephone call from the Northbridge police, the defendant said that the police wanted his firearm identification card and his gun, said it was the victim's "fault," and that "[h]e should have just blown her away [earlier] and gotten it over with." On October 15, the defendant "grabbed [the victim] in the neck area and just knocked her to the ground" in a restaurant parking lot. In December, the victim brought one of her children to a hospital suffering from respiratory arrest, and the defendant told a nurse that, "if anything happened to his daughter, the [nurse] better lock him up in [the] emergency mental health [facility] because he would kill [the victim]."[1] The defendant concedes that the evidence regarding the October 15, 1993, incident was properly

---

[1] The Commonwealth introduced evidence of another incident that was said to have occurred in the fall of 1993. After the victim pulled up her nightshirt in view of a babysitter, of whose presence in the room she may not have been aware, the defendant "followed [her] into the bedroom and pinned her up against the wall, by the throat, and told her he would kill her if she ever showed her butt to a fifteen year old." But the witness who testified regarding this incident, the babysitter, testified that he did not see or hear what occurred in the bedroom, and that he was merely repeating what the victim had told him after the incident. The evidence of what the victim said to the babysitter was inadmissible hearsay. There is no hearsay exception for statements of deceased persons in criminal cases, *Commonwealth* v. *Mandeville*, 386 Mass. 393, 398 n.3 (1982), and the circumstances of the victim's statement to the babysitter did not qualify it as an excited utterance. When the witness first repeated the statement at trial, the defendant did not object. When he again repeated it during redirect examination, the judge, after a voir dire, sustained the defendant's objection to it. No curative instruction was sought or given. The defendant does not argue the hearsay point. Although the statement was

admitted, but argues that the evidence regarding the other incidents was more prejudicial than probative.

"It is well settled that the prosecution may not introduce evidence that a defendant has previously misbehaved, indictably or not, for the purposes of showing his bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). "Evidence of a hostile relationship between a defendant and his spouse may [however] be admitted as relevant to the defendant's motive to kill the victim spouse." *Commonwealth* v. *Gil*, 393 Mass. 204, 215 (1984). A defendant's oral threats and repeated acts of violence may indicate "settled ill-will towards his wife, and therefore [bear] directly on the question whether there was any motive for him to commit the crime." *Commonwealth* v. *Holmes*, 157 Mass. 233, 240 (1892). See *Commonwealth* v. *Rodriguez*, 425 Mass. 361, 370-371 (1997); *Commonwealth* v. *Gil*, *supra* at 215-216; *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 850 (1980); *Commonwealth* v. *Bonomi*, 335 Mass. 327, 343 (1957). The evidence regarding the incidents introduced in this case was directly relevant in establishing the defendant's possible motive and intent in killing his wife. Such evidence was especially important in view of the defendant's claim that he killed her in self-defense.

The judge's limiting instructions reduced the possible prejudicial effect of this evidence. She told the jury that prior bad act evidence may not be used to show that the defendant has a "criminal personality or bad character." She instructed the jury more than once that such evidence may be used only to show the defendant's motive or intent.

B

The defendant argues that he was denied the effective assistance of counsel because his counsel did not offer any expert testimony regarding the defendant's intoxication and lifelong alcohol problems. Such evidence would have been relevant in determining whether he had the knowledge and intent required for finding that he acted with malice and extreme atrocity or cruelty. Defense counsel filed a series of pretrial motions to al-

inadmissible hearsay, the fact that the jury heard it did not create a substantial likelihood of a miscarriage of justice. The testimony regarding the incident was merely cumulative.

low him to employ a specialist in alcoholism, to conduct a CAT scan, and to employ a psychiatrist. These motions were allowed. The defendant asserts that the judge's allowance of these motions for medical and psychiatric evaluations, and the expenditure of public funds for such evaluations, indicate that his counsel should have presented medical and psychiatric evidence at trial, and that the failure to do so constituted ineffective assistance of counsel.

Under G. L. c. 278, § 33E, which provides a standard more favorable to the defendant than the ineffective assistance of counsel standard we articulated in *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), the defendant bears the burden of showing that his counsel's error was "likely to have unfairly influenced the jury's verdict." *Commonwealth* v. *Plant*, 417 Mass. 704, 715 (1994). In the instant case, the defendant has failed to identify any error by the trial counsel. Defense counsel's decision not to present any expert testimony at trial alone has not been shown to be an error. Defense counsel sought the opinions of several experts. That he did not present those opinions is consistent with the proposition that they would not have been helpful to the defendant.

## C

The defendant contends that, in the closing remarks, the prosecutor made misstatements about the defendant's size which might have prejudiced the jury. The prosecutor referred to the defendant as a "six foot two, two hundred to two hundred thirty pound fullback defensive tackle." The defendant testified that he had played football positions of full back and defensive tackle in high school, and that he stood six foot and two inches. He further testified that he weighed 185 pounds on the day of the murder, and 230 pounds at trial. The defendant contends that the discrepancy between his actual weight on the day of the murder and the prosecutor's description undermined his defense of self-defense and created a substantial likelihood of a miscarriage of justice.

The prosecutor's physical description of the defendant was aimed at attacking the defendant's claim that he lived in constant, or at least intermittent, fear of the victim. The defense counsel did not object to the prosecutor's description. Furthermore, even assuming arguendo that the discrepancy constituted a mistake on the prosecutor's part, we find it highly unlikely

that an alternative description of the defendant as weighing only 185 pounds would have altered the jury's conclusion.

### D

Consistent with the defendant's requests, the judge instructed the jury that they could consider whether the defendant's intoxication negated his intent to kill with malice, extreme atrocity or cruelty, or deliberate premeditation. The defendant now argues that the judge should have given a more elaborate instruction explaining how intoxication may reduce culpability.

"All that we have ever required be said to juries about the effect of drug consumption on a defendant's intent or knowledge would be satisfied by a simple instruction that the jury may consider credible evidence of the effects of the defendant's consumption of drugs in deciding whether the Commonwealth had met its burden of proving the defendant's state of mind beyond a reasonable doubt." *Commonwealth* v. *Sires*, 413 Mass. 292, 300 (1992). The judge gave just such instructions on intoxication at four separate points in her final charge. The defendant did not raise any objection to the judge's instructions, nor did he ask that the charge be supplemented in any way. Indeed, he concedes here that the instructions given were consistent with the instructions approved by this court in *Commonwealth* v. *Sires*, *supra* at 300-301, and *Commonwealth* v. *Morgan*, 422 Mass. 373, 376-378 (1996). The defendant's contention is without merit.

### E

The judge's initial third prong malice instructions were defective. She said that the third prong of malice consisted of "an intent to do an act that plainly and strongly will cause death or grievous bodily harm." A proper third prong malice instruction would not have included the term "grievous bodily harm." *Commonwealth* v. *Fuller*, 421 Mass. 400, 412 (1995). The defendant correctly points out that the third prong of malice is relevant here, as he was convicted of murder in the first degree committed with extreme atrocity or cruelty. See *Commonwealth* v. *Morgan*, *supra* at 382.

The defendant never objected to the incorrect charge. Nevertheless, the judge realized her error less than one hour after the jury retired, and took prompt action to correct her

mistake. She ordered the jury to stop deliberating until further instructions could be provided. The judge then repeated the correct instruction four times. She also listed the three prongs of malice on a chalkboard, and then erased the words "or grievous bodily injury." The judge concluded by saying: "I hope that clarifies it, because there were two different terms. There was at least one and possibly two occasions when I misspoke on the third prong of malice." Over three hours later, the jury returned the verdict.

Despite the judge's correction of her instructions, and although he neither objected to the instructions at trial nor moved for a new trial after the giving of the corrected charge, the defendant now asserts that the judge's initial misstatements confused the jury thereby creating a substantial likelihood of a miscarriage of justice. The judge's actions "substantially corrected any misconception which may have arisen in the minds of the jurors," *Commonwealth* v. *Kosilek*, 423 Mass. 449, 454 (1996), and her charge, viewed in its entirety, certainly did not create a substantial likelihood of a miscarriage of justice. *Id.*

## F

Finally, the defendant argues that a new trial is warranted because, on the second day of deliberations, the jurors discussed his case while all jurors were present, but before they were asked to begin deliberation by the judge. The judge's receipt of a question from the jury on the morning of the second day of deliberations prompted the defense counsel to ask the judge to determine whether the jurors were deliberating before the official start of deliberations. The judge summoned the jury to the courtroom, and asked them a series of questions. The jurors' answers indicated that the jurors had discussed the case before the official start of deliberations that morning, but also that the jurors had not been exposed to any extraneous influence. Apparently satisfied, the defense counsel did not request any further inquiry into the matter nor move for a mistrial. A new trial is not warranted given that the defendant has completely failed to show, or even to allege, that the jury had in fact been exposed to extraneous influences. *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979).

We have examined the entire record and conclude that the

interests of justice do not require ordering a new trial or directing the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*