## COMMONWEALTH *vs.* JEREMAIS BINS.[1]

Middlesex. October 5, 2012. - June 5, 2013.

Present: IRELAND, C.J., SPINA, CORDY, DUFFLY, & LENK, JJ.

*Homicide. Constitutional Law,* Admissions and confessions, Waiver of
constitutional rights, Assistance of counsel, Voluntariness of statement,
Confrontation of witnesses. *Due Process of Law,* Assistance of counsel.
*Evidence,* Voluntariness of statement, Hearsay, State of mind, Expert
opinion. *Practice, Criminal,* Motion to suppress, Admissions and confes-
sions, Waiver, Assistance of counsel, Voluntariness of statement, Interpreter,
Instructions to jury, Hearsay, State of mind, Argument by prosecutor,
Capital case, Confrontation of witnesses. *Witness,* Expert. *Interpreter.*
*Deoxyribonucleic Acid.*

A Superior Court judge did not err in denying a criminal defendant's pretrial
motion to suppress his statement to police, where the defendant understood
the Miranda rights that were read to him in Portuguese, in that the warn-
ings he received concerning his right to the presence of an attorney and
that he would be provided with an attorney if he could not afford one
eliminated any confusion arising from minor variations in translation and
interpretation [357-360]; and where, in the totality of the circumstances,
the defendant voluntarily waived his Miranda rights and thereafter voluntar-
ily made his statement, in that the police scrupulously honored his invoca-
tion on a limited basis of his right to silence by approaching the defendant
nine hours after the defendant stated he did not wish to speak to them at
that time but might be willing to do so later; in that no interrogation of
him occurred after he invoked his right to counsel and subsequently initi-
ated further conversation with police of his own volition; and in that each
set of warnings he received was given in his native Portuguese, none of
the warnings was omitted from any of the recitations, and none was mis-
stated to the point of being contradictory [360-363].
At a murder trial, the judge did not abuse his discretion in the admission of a
victim's out-of-court statements to show her state of mind prior to the kill-
ings, for the permissible purpose of proving the defendant's motive to kill;
further, the judge's limiting instructions reduced the possible prejudicial
effect of that evidence. [363-366]
At a murder trial, no substantial likelihood of a miscarriage of justice arose
from the prosecutor's closing argument, where the prosecutor's comment
on deliberate premeditation was proper, and any possible confusion was
remedied by the judge's final charge; and where the prosecutor's remarks
on out-of-court statements by the victim that had been admitted solely to

---

[1]As is our custom, we spell the defendant's name as it appears in the
indictment.

establish her state of mind were subtle and fleeting, the jury received contemporaneous and final instructions on the proper and limited purpose for which the statements had been admitted, and any effect on the jury was minimal given the overwhelming evidence otherwise admitted against the defendant. [366-368]

At a murder trial, the judge did not err in declining to instruct the jury on voluntary manslaughter, where no view of the evidence supported such an instruction. [368-370]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the erroneous admission of certain evidence through the testimony of the Commonwealth's deoxyribonucleic acid expert witness. [370-371]

INDICTMENTS found and returned in the Superior Court Department on July 27, 2006.

A pretrial motion to suppress evidence was heard by *Isaac Borenstein*, J., and the cases were tried before *John T. Lu*, J.

*Jeffrey L. Baler* for the defendant.

*Fawn D. Balliro Andersen*, Assistant District Attorney (*Lee Hettinger*, Assistant District Attorney, with her) for the Commonwealth.

LENK, J. On May 20, 2006, the defendant beat his wife and eleven year old stepson to death with a hammer. He turned himself in and made a long statement to police in his native Portuguese. The statement was translated contemporaneously by an officer who was fluent in both Portuguese and English. Over the defendant's objection, and following a hearing on his motion to suppress the statement, before a judge who was not the trial judge, the statement was introduced in evidence at the defendant's trial in the Superior Court. The jury found the defendant guilty on two indictments charging murder in the first degree based on the theory of deliberate premeditation.

The defendant claims that his statement to police should have been suppressed because its admission violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. He maintains also that certain out-of-court statements were admitted improperly under the state of mind exception to the rule against hearsay; that the prosecutor misstated the law of premeditation and misused the aforementioned out-of-court statements in his closing argument; and that the judge erred in

denying his request for a voluntary manslaughter instruction. We reject the defendant's claims and, after review of the entire record pursuant to our obligation under G. L. c. 278, § 33E, decline to exercise our authority to order a new trial or to reduce the defendant's convictions to a lesser degree of guilt.

1. *Facts.* a. *The killings.* We recite the facts the jury could have found, reserving some facts for later discussion. The defendant met Carla Souza in October, 2004, at the Mormon Church in the town of Weston. Both Souza and the defendant were Brazilian immigrants. They began dating, and in April, 2005, they married. The couple lived in Framingham with Caique, Souza's son from a previous marriage. Although Souza and the defendant were initially happy, they soon began experiencing problems in their relationship. First, Souza was a devout Mormon, and the defendant was unsupportive of her church activities. Souza attended church services regularly and hosted Mormon missionaries for meals and meetings in her home several times a week. The defendant felt that the church was controlling his home. Second, Caique did not accept Souza's and the defendant's relationship. Caique would hit Souza and the defendant, or physically put himself between them when they were embracing.

In December, 2005, Souza and the defendant had a son, Felipe. During the course of Souza's pregnancy, she experienced complications that required her to stop working. This put a serious financial burden on the defendant, a carpenter who did not have steady employment. He became irritable; Souza told friends that he was not treating her well. He called Souza a "prostitute" and broke things in their apartment. He wanted Souza to spend less time at church and more time at home. He complained about Souza hosting Mormon missionaries for meals and began suspecting that Souza was romantically involved with the missionaries. He felt that Souza was disobedient. On one occasion, sometime after Felipe was born, the defendant told Souza's brother, who at the time did not consider it a serious threat, "I've been very anxious. I can't put up with this anymore, and if she doesn't stop, I will kill her."

On the evening of May 20, 2006, the defendant called the missionaries and told them never to come to his home again. He told Souza the missionaries would no longer be welcome in

their home, and that Felipe would "never be a Mormon." Souza became angry, sticking her finger in the defendant's face and pushing him. The defendant took Felipe from his crib and lay down on the bed, holding the baby. Souza tried to take Felipe from the defendant's arms but could not do so, because the defendant was stronger than she. Picking up the telephone, Souza told the defendant that she was going to destroy him, and she telephoned the police. The defendant became "furious." He felt that he struggled and worked for his family, and that his work was "never appreciated." He went to the closet and retrieved a large hammer.

As Souza was sitting on the bed, talking to the 911 operator on the telephone, the defendant hit her on the head with the hammer, striking her approximately six times. Caique came into the room, and the defendant struck Caique in the head with the hammer approximately three times. The defendant picked up Felipe and left the apartment. Both Souza and Caique died that night from their injuries.

b. *The defendant's statement to police.* Approximately one and one-half hours after leaving his apartment, the defendant took a taxicab to the Framingham police station and turned himself in. He handed Felipe to the officer who met him inside the station, and stated, in English, "[S]orry." Because the defendant spoke limited English, Officer Duarte Calvao of the Framingham police department was brought in to interpret. Calvao was born in Portugal and speaks fluent Portuguese.[2]

While the defendant waited in the booking area of the Framingham police station, Calvao read him the Miranda warnings from a sign posted on the wall where the rights were printed in Portuguese. He asked the defendant to read along. The defend-

---

[2]Officer Duarte Calvao of the Framingham police department speaks "continental Portuguese," while the defendant speaks "Brazilian Portuguese." At trial, Calvao described the differences between continental Portuguese and Brazilian Portuguese as being analogous to the differences between British English and American English, i.e., the two varieties of Portuguese share the same underlying language but employ a slightly different vocabulary and manner of speaking. Calvao was not formally trained or certified as an interpreter. However, during eight years as a police officer in Framingham prior to May 20, 2006, he had communicated in Portuguese with members of the town's Brazilian community hundreds of times, including providing Miranda warnings in Portuguese hundreds of times, and never required an interpreter.

ant said he could read, and he looked at the sign as Calvao read. As later translated into English by a certified court interpreter, the rights Calvao read were as follows:

> "You have the right to remain silent. You have the right to talk to your attorney, to know your opinion before doing any question. Anything that you say could be used against you in the court. If you have no conditions to pay a lawyer, one will be appointed for you before the court. . . ."

> "If you decide to answer our questions this moment with no lawyer, you have the right to give up answering questions at any moment you want."[3]

Calvao asked the defendant, in Portuguese, if he understood what Calvao had just read. The defendant nodded in the affirmative. Calvao then read the defendant his statutory rights regarding telephone calls, G. L. c. 276, § 33A, from a form where the rights were printed in continental Portuguese. The defendant signed the form, indicating that he understood those rights, and subsequently made a telephone call.

At approximately 2 a.m., Calvao said to the defendant, in Portuguese, "Come with us," and the defendant complied.[4] He was taken to an interview room with Calvao, Detective James Green, and State Trooper William Donoghue. Calvao read the defendant his Miranda rights from a form printed in Portuguese. As later translated into English by a certified court interpreter, the rights Calvao read this time were as follows:

> "[H]ave the right to remain silent. Everything you say

---

[3] There is some question as to the proper English translation of the right to an attorney as written on the sign in the Framingham police station. Following an evidentiary hearing on the defendant's motion to suppress, the motion judge found that the right to an attorney, as written on the sign, translated into English as, "Has the [gender error] right [misspelled] to speak [space left in the middle of the word] to a lawyer to know [his or your] opinion [misspelled] before we ask you [misspelled] any question and of [sic]. If [you] do not have the possibilities to pay to a lawyer, one will be named to [yourself in continental Portuguese; itself in Brazilian Portuguese] before the questioning if [you] wish."

[4] The motion judge found that the defendant "went upstairs to talk with all of the officers voluntarily, willingly and understanding that he did not have to go."

can be used against itself in court. Have the right to speak to an attorney and have him present during questioning. If you don't have possession of hiring an attorney, you be [either 'supplied' or 'recognized'] before being questioned, and if you decide to answer questions, you have the right to stop when you want."

Calvao asked the defendant whether he understood his rights, and the defendant said that he did. The defendant signed a copy of the form with the rights printed in Portuguese. Calvao then asked the defendant, in Portuguese, if he was willing to speak about the case, and the defendant said in Portuguese, "[S]orry," and then in English, "[T]oday, no." Calvao asked again, in Portuguese, whether the defendant understood his rights. The defendant said that he did, and again stated in English, "I'm sorry." The interview was then terminated.[5]

Between approximately 2 A.M. and 3 A.M., the defendant was "processed" by the State police crime scene unit, who photographed him, took blood samples from his person, and confiscated his clothing for deoxyribonucleic acid (DNA) testing. During this time, Calvao remained with the defendant to serve as interpreter. At some point during the hour, the defendant spontaneously said to Calvao that he would talk about the case "tomorrow." Shortly after 3 A.M., the defendant was booked, and Calvao told him, in Portuguese, that he was under arrest and charged with murder. The defendant was placed in a cell for the night.

At approximately 11 A.M., Calvao, Green, and Donoghue went to the defendant's cell and woke him up. They asked if he wanted to talk to them, and he said that he did.[6] In the interview room, Calvao again read the defendant the Miranda warnings in Portuguese from a printed form. As later translated into English

---

[5]The motion judge found that the police reasonably understood the defendant to mean that, although he did not want to talk then, he might want to talk later.

[6]It is unclear whether the officers asked the defendant whether he wanted to talk to them or simply stated, "[C]ome on upstairs." The motion judge found that the officers asked the defendant if he would like to speak with them, and that this "was not done in a heavy-handed, overbearing, or coercive manner." The judge found that the defendant "agreed to talk to police voluntarily, knowingly and intelligently, and he went to the [interview] room freely, willingly, and voluntarily."

by a certified court interpreter, he stated, "You have the right to remain silent. . . . Anything you say . . . can be used against you in the trial." The defendant indicated that he understood these warnings. Calvao said, "You have the right to have a lawyer. Do you understand this right?" The defendant asked, in Portuguese, "How do I go about getting a lawyer?"

After conferring with Green and Donoghue, Calvao stated, in Portuguese, "That is a decision that you have to make." The defendant then asked, "In this statement, is there a way for me to have a lawyer?" Calvao said, "If you want a lawyer," to which the defendant replied, "I don't have the money to hire a lawyer." At this point, Calvao said, still in Portuguese,

> "I'm going to read the rest, ok? You have the right to have a lawyer. . . If you cannot obtain a lawyer the court will point one out to represent you, understand? . . . When you go to the court, if you do not have assets the court can point one out to represent . . . ."

The defendant answered, in Portuguese, "I would like to come my lawyer by my side before answering any questions." Calvao asked, "At this moment, do you want a lawyer?" The defendant said that he did. Calvao said, "Do you want to explain your side of the story or do you want to have a lawyer with you?" The defendant said that he wanted a lawyer present. The interview was then terminated.[7]

As the officers were leaving the room, the defendant initiated conversation, asking, in Portuguese, if the officers were members of the Mormon Church.[8] After conferring with Green and Donoghue, Calvao stated, in Portuguese, that none of the three officers were members of the Mormon Church. The defendant then said that he wanted to talk and give them his side of the story. Calvao told the defendant that they could not talk to him because he had invoked his right to an attorney. The defendant asked about his right to stop answering questions or to answer only

---

[7] The motion judge found that "[n]o interrogation of the defendant occurred at all after this request for an attorney."

[8] The motion judge found that the defendant "initiated a conversation with [the officers] completely of his own volition," and that he did so "without any prompting, questioning, or interrogating from or by [the officers]."

certain questions, and Calvao told him that if he spoke with them he would only have to answer the questions he wanted to answer. The defendant again said that he wanted to talk, and he stated this desire a third time when Calvao asked for clarification.

At that point, Donoghue left the room to confer with his supervisors. At approximately 12 P.M., Calvao, Green, and Donoghue restarted the interview. Again, Calvao read the defendant the Miranda warnings in Portuguese, using a printed form. Calvao said,

> "You have the right to keep silent. . . . Anything you say can and be [*sic*] used against you in the trial. . . . You have the right to have a lawyer . . . . If you cannot obtain a lawyer, the court will point one out to represent you. . . ."

The defendant indicated he understood each right, said that he wished to waive his rights and speak to the police, and signed a form waiving his rights.

Thereafter, the defendant made a long statement in Portuguese, detailing his marriage to Souza and confessing to the killings of Souza and Caique. The conversation was mostly driven by the defendant. On a few occasions, when the defendant was describing the decline of his marriage, the officers tried unsuccessfully to focus his attention on the events of the previous evening. At the end of the statement, in response to questions by Calvao, the defendant indicated that he made the statement of his own free will and was not forced to speak. Finally, he said, "My life ends here."

2. *Prior proceedings.* a. *Motion to suppress defendant's statement.* The defendant's motion to suppress his statement to police was denied after an evidentiary hearing. The motion judge issued a twenty-eight page written decision, including detailed findings of fact. The judge found that Calvao was not biased and was qualified to serve as an interpreter; that, in the first of the four recitations of the Miranda warnings, which was the only recitation not recorded and transcribed, Calvao acted in good faith and slowly went through all the rights with the defendant; and that the Commonwealth proved beyond a reasonable doubt that the defendant waived his Miranda rights voluntarily, knowingly, and intelligently before making his statement to police.

Subsequently, before the trial judge, the defendant objected to his statement "coming in in any form whatsoever." The judge overruled the objection, but stated that it "now saves your right as to any issue contained in the motion to suppress brought before the judge in pretrial."[9]

b. *Motion to exclude statements made by Souza.* Before trial, the defendant moved in limine to prohibit the prosecutor from introducing evidence of prior misconduct by the defendant, while the prosecutor moved to admit certain out-of-court statements by Souza that included references to prior bad acts. The prosecutor argued that the out-of-court statements were admissible as evidence of Souza's state of mind to prove the defendant's motive to kill. He argued further that the statements were corroborated by the defendant's own statement to police, which similarly described the deterioration of the marriage. The judge reserved ruling on the motion pretrial, but ultimately allowed admission of most of the statements, stating explicitly that the defendant's objection to their admission was preserved.

c. *Evidence before the jury.* The Commonwealth called sixteen witnesses. These included members of Souza's family and several police officers, as well as the medical examiner, Dr. William Zane; Michelle Levasseur, a forensic scientist; and Lynn Schneeweis, acting DNA unit supervisor at the State police crime laboratory. Zane described the autopsies of Souza and Caique. He testified that Souza died as a result of "multiple skull fractures with a brain laceration due to multiple impacts with a blunt object," and that Caique died as a result of multiple skull fractures and brain lacerations due to multiple impacts with a blunt object. Levasseur described blood found at the crime scene and on the defendant's person and clothing, and testified that she took samples of this blood for DNA testing. Schneeweis described DNA analysis of the blood samples, and offered her expert opinion that various of the so-called unknown samples collected from the crime scene and from the defendant's person

[9]Additionally, the jury were instructed that they could consider the defendant's statement as evidence only if they found beyond a reasonable doubt that the defendant made the statement and that he did so "voluntarily, freely and rationally." The defendant does not challenge the sufficiency of the evidence before the jury on this or any other point.

and clothing matched "known" DNA samples of Souza and Caique.

The Commonwealth also presented testimony from two witnesses who observed and interacted with the defendant in the time between the killings and his arrival at the police station, as well as testimony that one of these witnesses identified the defendant from a photographic array presented by police. The jury heard a recording of Souza's 911 telephone call, in which she said, "Can you come to my house, please? I have a problem with my husband," before she stopped speaking and began moaning. The jury also heard the tape recordings of the defendant's statement to police; before the recordings were played, each juror was given a copy of a court-certified interpreter's written translation of the statement.

The jury found the defendant guilty of both charges of murder in the first degree. The judge sentenced the defendant to two consecutive life sentences.

3. *Discussion.* a. *Defendant's statement.* The defendant claims that his motion to suppress his statement to police should have been granted because the Commonwealth failed to establish beyond a reasonable doubt that the Miranda warnings given were proper, that the defendant voluntarily waived his Miranda rights, and that he made the statement voluntarily. "In reviewing a denial of a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, but conduct an independent review of the judge's ultimate findings and conclusions of law." *Commonwealth* v. *Washington*, 449 Mass. 476, 480 (2007), citing *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004). "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996), citing *Commonwealth* v. *Robbins*, 407 Mass. 147, 151 (1990).

In *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966) (*Miranda*), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." These safeguards

require that, prior to any questioning, a defendant be warned that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. "The defendant may waive these rights, provided that the waiver is made voluntarily, knowingly, and intelligently[,] but 'unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.' " *Commonwealth* v. *Adams*, 389 Mass. 265, 268 (1983), quoting *Miranda, supra.* The Commonwealth must prove the validity of the defendant's waiver beyond a reasonable doubt. *Commonwealth* v. *Silanskas*, 433 Mass. 678, 685 (2001), citing *Commonwealth* v. *Larkin*, 429 Mass. 426, 438 (1999).

i. *Sufficiency of the warnings.* The defendant argues that the warnings given were insufficient because they did not properly inform him that an attorney would be appointed for him prior to questioning and without charge if he could not afford one. "No prescribed set of words must be used to provide the warnings required by the *Miranda* case." *Commonwealth* v. *Ghee*, 414 Mass. 313, 318 (1993). Rather, the question is whether the warnings given effectively conveyed the defendant's rights in a language the defendant could comprehend. See *Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 544, cert. denied, 537 U.S. 942 (2002), *S.C.*, 456 Mass. 490 (2002).

The motion judge found that Calvao gave the defendant his Miranda warnings in Portuguese on four separate occasions and that Calvao was qualified to serve as an interpreter. The judge ruled that the defendant understood all of his rights each time that Calvao recited them. While we do not agree that the defendant understood all of his Miranda rights each time that Calvao recited them, we agree that the defendant understood all of his Miranda rights before he made his statement to police.

Although the defendant speaks Brazilian Portuguese, he understood the continental Portuguese spoken by Calvao. In his written memorandum of decision, the motion judge found that the following facts, together with all the evidence and circumstances, indicated that the defendant understood the rights

Calvao read him: the defendant indicated that he understood his telephone rights, G. L. c. 276, § 33A, which were read to him in continental Portuguese, and subsequently placed a telephone call; the defendant indicated after the second recitation of the Miranda rights that he did not want to speak to the officers at that time but would perhaps speak to them later; and, during the third recitation of his rights, the defendant asked clarifying questions about obtaining an attorney and then effectively exercised his right to counsel. The judge concluded that any "minor variations in translation and/or interpretation did not interfere with an accurate, effective, full and fair administration of Miranda rights to [the defendant]." We discern no error in this conclusion.

In his decision, the motion judge did not parse the varying recitations of each of the individual rights. Because the defendant challenges specifically the adequacy of the warnings concerning his right to counsel, we consider in some detail the warnings given him as to this right.

First, the defendant was told properly that he had the right to the presence of an attorney. The motion judge found that, in the first recitation of the defendant's rights, Calvao read, "[You] has [*sic*] the right to speak to a lawyer to know [his or your] opinion before we ask you any question." During the second recitation, as translated by a court-certified interpreter, Calvao said, "[You h]ave the right to speak to an attorney and have him present during questioning." During the third and fourth recitations, as translated by a court-certified interpreter, Calvao said, "You have the right to have a lawyer." These warnings properly conveyed the defendant's right to the presence of an attorney during questioning.

Second, the defendant was told properly that he would be provided with an attorney if he could not afford one. Although the first two recitations of the defendant's rights were arguably deficient on this point, the defendant asked for and received satisfactory clarification of the right prior to making his statement. During the third recitation, he asked how he could go about obtaining an attorney, and he said that he could not afford to pay for one. In response, Calvao continued with his recitation of the defendant's rights, stating, "If you cannot obtain a lawyer

the court will point one out to represent you. . . . When you go to the court, if you do not have assets the court can point one out to represent."

We conclude that these warnings eliminated any confusion, as evinced by the fact that the defendant immediately thereafter invoked his right to counsel. Further, during the fourth recitation, just before the defendant made his statement to police, Calvao told him, "If you cannot obtain a lawyer, the court will point one out to represent you." This warning, consistent with those provided during the third recitation, properly conveyed the defendant's right to appointed counsel if he could not afford to hire an attorney.[10]

ii. *Voluntariness.* The defendant argues that he did not voluntarily waive his Miranda rights or voluntarily make his statement to police, because he did not understand his Miranda rights and because the officers did not stop interrogating him when he invoked his rights to silence and to counsel. "The voluntariness of the waiver on the basis of *Miranda* and the voluntariness of the statements on due process grounds are separate and distinct issues but they are both determined in light of the totality of the circumstances and they share many of the same relevant factors." *Commonwealth* v. *Edwards,* 420 Mass. 666, 673 (1995). "In determining whether the defendant's statements were voluntary, we consider whether the statements were the product of a 'rational intellect' and a 'free will.' " *Commonwealth* v. *Woodbine,* 461 Mass. 720 (2012), quoting *Commonwealth* v. *Edwards, supra.* The Commonwealth bears the burden of proving beyond a reason-

---

[10]In *Commonwealth* v. *Vuthy Seng,* 436 Mass. 537, 544-545, cert. denied, 537 U.S. 942 (2002), *S.C.,* 456 Mass. 490 (2010), we held that warnings were insufficient where police stated that, if the defendant did not have money for an attorney, "they can help find one for you." The circumstances here differ from that case in at least three key respects: (1) Calvao stated that "the court" would point out an attorney to represent the defendant, while the warnings in *Commonwealth* v. *Vuthy Seng, supra,* indicated only that an unspecified "they" could help the defendant find an attorney; (2) the warnings Calvao provided stated definitely that the court *"will* point [an attorney] out to represent you" (emphasis supplied), while the warnings in *Commonwealth* v. *Vuthy Seng, supra,* suggested merely that the defendant could receive assistance in finding an attorney; and (3) the defendant here demonstrated his comprehension of his right to counsel by invoking that right after the third recitation, while in *Commonwealth* v. *Vuthy Seng, supra,* there was no comparable showing.

able doubt that the defendant voluntarily waived his rights and voluntarily made his statement to police. See *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000), and cases cited.

Here, the totality of the circumstances indicates that the defendant voluntarily waived his rights and thereafter voluntarily made his statement to police. The motion judge found that the defendant understood his Miranda rights prior to making his statement to police, and we discern no error in this finding. Further, the judge found that the defendant turned himself in at the police station; voluntarily went with the officers to the interview room at approximately 2 A.M.; slept for several hours before making a statement; again went voluntarily with the officers to the interview room at approximately 11 A.M.; invoked his right to counsel before any questioning occurred; spontaneously reinitiated conversation; indicated a desire to make a statement only after learning that the officers were not Mormon and after asking whether he could be required to answer any specific questions; and chose which questions to answer and "how the flow of the interview took place." These facts indicate that the defendant was in control and that both his waiver and his statement were products of a rational mind.

The defendant argues that the officers continued interrogating him after he stated that he did not wish to talk, and that their persistence left him "with the impression that he was not acting properly," thereby rendering his statement involuntary. This contention is unpersuasive. After the second recitation of his rights, at approximately 2 A.M., the defendant invoked his right to silence by stating, "[T]oday, no." The judge found that the officers reasonably understood the defendant's words, in conjunction with his comment, "tomorrow," made to Calvao sometime between 2 and 3 A.M., to mean that the defendant did not wish to speak to police at that time, but might be willing to speak to them later. The defendant thereby invoked his right to silence on a limited basis, inviting the officers to make a renewed attempt to interview him later that morning. The judge found that the officers thereafter ended the interview, and only approached the defendant again "some nine hours" later. In so doing, the officers "scrupulously honored" the defendant's ex-

pressly limited invocation of his right to silence.[11] See *Commonwealth* v. *Brant*, 380 Mass. 876, 882 (1980), cert. denied, 449 U.S. 1994, quoting *Miranda, supra* at 474, 479.

The defendant similarly argues that the officers impermissibly continued interrogating him after he invoked his right to counsel, and improperly suggested that he could either make a statement or have a lawyer present, thereby rendering his statement involuntary. This, too, is unpersuasive. The motion judge found that, after the third recitation of the Miranda rights, at approximately 11 A.M., the defendant invoked his right to counsel. "[O]nce a suspect invokes his right to counsel, police interrogation must cease immediately, unless the suspect 'initiates further communication, exchanges, or conversations with the police.' " *Commonwealth* v. *Sarourt Nom*, 426 Mass. 152, 156-157 (1997), quoting *Edwards* v. *Arizona*, 451 U.S. 477, 485 (1981). Here, the judge found that no interrogation of the defendant occurred after he invoked his right to counsel, and that the defendant subsequently initiated further conversation with police of his own volition. We discern no error in these findings. Because the defendant initiated further conversation with the officers, and subsequently stated three times that he wished to speak with them about the case, the officers' conduct did not violate the defendant's right to counsel. See *Commonwealth* v. *Sarourt Nom, supra.*

Finally, the differing sets of warnings the defendant received were not so contradictory or confusing when taken together as to render his waiver involuntary. See *Commonwealth* v. *Vuthy Seng, supra* at 547 ("where two sets of warnings are given and one is defective or incomplete and the circumstances are such that the defendant would be confused by the discrepancy or omission, a waiver so obtained is not voluntary"). In *Commonwealth* v. *Vuthy Seng, supra* at 540, the defendant received

---

[11]As stated, the defendant indicated, at approximately 2 A.M. and again sometime during the subsequent hour, that he might be willing to talk "tomorrow." We recognize that the officers did not wait until the subsequent calendar day to resume the interview, instead approaching the defendant again at approximately 11 A.M. the same morning. Nonetheless, we do not understand this to be a violation of the defendant's limited invocation of his right to silence, as the officers reasonably considered 11 A.M. , after the defendant had slept several hours into the late morning, to be the next day.

two sets of warnings, the first in his native Khmer and the second in English.

> "The Khmer version of the rights was deficient in several key respects. The defendant was not advised of his right to remain silent. Indeed, several of the warnings implied the opposite. . . . The defendant was never advised in Khmer that anything he said could be used against him in court. . . . The final defect in the Khmer warnings was the failure to state that a lawyer would be appointed if the defendant could not afford one."

*Id.* at 544. We concluded that the correct recitation of the defendant's rights in English did not cure the deficiencies in the Khmer warnings given earlier, because the officer indicated that he was reading the same rights in English that he had read in Khmer, thereby integrating "the erroneous Khmer warnings into the English version." *Id.* at 547. We noted that the "omission of key warnings from the Khmer version that were then included in the English version, particularly when Khmer was the defendant's native language . . . could only have been confusing." *Id.* at 547-548.

Here, by contrast, each set of warnings the defendant received was given in Portuguese, the defendant's native language. None of the warnings was omitted from any of the recitations, and none was misstated to the point of being contradictory from one recitation to the next. In these circumstances, we conclude that the defendant would not have been confused by any discrepancy. See *id.* at 547. The totality of the circumstances demonstrates that the defendant both voluntarily waived his *Miranda* rights and thereafter voluntarily made his statement to police. See *Commonwealth* v. *Woodbine, supra.*

b. *Souza's statements.* As a result of the judge's determination that Souza's statements could be admitted to show her state of mind prior to the killings, Leila Ferreira, a friend of Souza, was permitted to testify to the following statements by Souza: (1) Souza and the defendant argued frequently about the church, and the defendant did not accept the fact that she spent time with the missionaries; (2) the defendant said he knew Souza liked younger men such as the missionaries; (3) the defendant

was jealous and could not understand Souza's relationship with the church; (4) in the week before Souza's death the defendant broke items inside their apartment; (5) the defendant was upset that Souza would never leave the church; and (6) the couple argued because the defendant wanted to return to Brazil and Souza did not.[12]

Additionally, Edinavia Abade Dos Santos, Souza's sister-in-law, was permitted to testify to the following statements by Souza: (1) after Souza stopped working during her pregnancy, the defendant had difficulty paying for the family expenses, and he became irritated and started to treat Souza badly; (2) the defendant was aggressive, using offensive language and breaking items in their apartment; and (3) the defendant called Souza a "prostitute."[13]

At several points, the judge instructed the jury that the statements made by Souza were admitted only for the limited purpose of establishing her state of mind, and could not be considered as proof of the criminal acts charged or as proof that the defendant had a bad character or a propensity to commit any criminal offense. See *Commonwealth v. Cormier*, 427 Mass. 446, 450 (1998) (limiting instruction "reduced possible prejudicial effect" where judge "told the jury that prior bad act evidence may not be used to show that the defendant has a 'criminal personality or bad character,' " and where judge instructed the jury "more than once that such evidence may be used only to show the defendant's motive or intent").

The defendant contends that Souza's statements constituted inadmissible hearsay and that the judge erred in admitting them. "Generally, determinations as to the admissibility of evidence lie 'within the sound discretion of the trial judge.' " *Commonwealth v. Jones*, 464 Mass. 16, 19-20 (2012), quoting *Commonwealth v. Dunn*, 407 Mass. 798, 807 (1990).

---

[12]In his statement to police, the defendant similarly asserted that he and Souza argued about her religion, that he told Souza he did not want the missionaries visiting their apartment, that he felt the missionaries were exercising control over his home, that he felt Souza was disobedient, and that he broke a computer in their apartment during an argument.

[13]In his statement to police, the defendant similarly said that his financial burden was difficult after Souza stopped working, and that he and Souza were "on the warpath" verbally.

"The broad rule on hearsay evidence interdicts the admission of a statement made out of court which is offered to prove the truth of what it asserted." *Commonwealth* v. *DelValle*, 351 Mass. 489, 491 (1966), *S.C.*, 353 Mass. 684 (1968). "However, declarations out of court may be admissible to prove the state of mind or intent of a person when it is a material issue." *Commonwealth* v. *Magraw*, 426 Mass. 589, 594 (1998). "The state of mind exception to the hearsay rule [permits] admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill . . . only when there is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it." *Commonwealth* v. *Qualls*, 425 Mass. 163, 167 (1997), *S.C.*, 440 Mass. 576 (2003). Evidence admitted to show the victim's state of mind permissibly may include statements describing a defendant's prior bad acts, as long as such statements are admitted for a proper purpose, such as proving the defendant's motive, and not to show that the defendant had a bad character or a propensity to commit criminal acts. See *Commonwealth* v. *Cormier*, *supra*; *Commonwealth* v. *Cruz*, 424 Mass. 207, 211-212 (1997). Such evidence may be admitted only to show the declarant's state of mind, and "not to prove the truth of what was stated." *Commonwealth* v. *Magraw*, *supra* at 594.

Souza's statements were admitted to show her state of mind, of which the defendant was aware, for the permissible purpose of proving the defendant's motive to kill. The Commonwealth's theory at trial was that the defendant was unable to control his home, and that his loss of control "ate away at him to the point where he finally decided to control his own fate and the fate of Caique and Carla." Souza's statements, including assertions that the defendant broke items in their apartment and called her a "prostitute," indicated that she felt her marriage was failing. Further, they indicated that she suffered the defendant's aggressive behavior and fought with him, rather than submitting to his will.

Souza's state of mind on these points was material to the defendant's motive to kill, because there was also evidence that the defendant was aware of her state of mind and responded to it. See *Commonwealth* v. *Qualls*, *supra*. Specifically, in his state-

ment to police, the defendant described the deterioration of his marriage and indicated that his frustration over Souza's feelings and conduct toward him led to the killings. It was within the judge's discretion to determine that the evidence established that the defendant was aware of Souza's negative feelings about their marriage, that her feelings made him feel he would never regain control of his home, and that this perceived loss of control led him to kill.

Accordingly, we conclude that the judge did not abuse his discretion in allowing admission of Souza's statements for the limited purpose of establishing her state of mind, as relevant to the defendant's motive to kill.[14] Further, the judge's limiting instructions, which were provided to the jury several times, "reduced the possible prejudicial effect of this evidence." *Commonwealth* v. *Cormier, supra.*

c. *Prosecutor's closing argument.* In closing, the prosecutor argued,

> "[The defendant] goes outside of the room and at that point he starts to reflect on his life, I'd suggest to you, that he has time to deliberate. He doesn't walk out the front door. He grabs a hammer and decides I'm going to strike her dead. . . . Deliberate premeditation isn't a matter of planning. It's a matter of being able to reflect on what your action is going to be. And in this case, he had plenty of time to reflect."[15]

The prosecutor also referred to the statements that the judge had admitted for the limited purpose of establishing Souza's state of mind:

> "Carla [Souza] knew it was getting worse. She told Edinavia Dos Santos . . . that [the defendant] was getting more aggressive. She told Leila Ferreira that he was breaking things in the house. He admits to breaking the computer

---

[14]The judge ruled explicitly that the probative value of Souza's statements outweighed their prejudicial effect. See *Commonwealth* v. *Bonds*, 445 Mass. 821, 831 (2006).

[15]In his instruction on the elements of murder in the first degree by deliberate premeditation, the judge correctly stated that the Commonwealth "must prove that the defendant thought before he acted; that is that he decided to kill after deliberation."

and getting frustrated. Carla tells her sister-in-law that he was calling her a prostitute and using other bad language the day before he killed her."

The defendant claims that the prosecutor's closing argument misstated the law of deliberate premeditation and misused Souza's out-of-court statements. Because the defendant did not object to the closing argument at trial, we review for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Emeny*, 463 Mass. 138, 145 (2012).[16]

In closing argument, "[l]awyers shall not and must not misstate principles of law." *Commonwealth* v. *Haas*, 373 Mass. 545, 545, 557 (1977), *S.C.*, 348 Mass. 806 (1986). "To prove that a defendant committed murder with deliberate premeditation, the Commonwealth must prove that the defendant resolved to kill after a period of reflection." *Commonwealth* v. *Chipman*, 418 Mass. 262, 269 (1994). The defendant claims that the prosecutor's closing suggested that deliberate premeditation requires only the opportunity to reflect, rather than actual reflection. We do not agree.

Although the prosecutor said that the defendant had "time to deliberate," and that deliberate premeditation is "a matter of being able to reflect on what your action is going to be," he argued also, in the same portion of his closing, that the defendant "reflect[ed] on his life" and "decide[d that he was] going to strike her dead." While deliberate premeditation requires actual reflection, see *id.*, it also requires, necessarily, the opportunity for actual reflection. In making the case that the killings were premeditated, the prosecutor properly argued both that the defendant had the opportunity to reflect, and that he actually did so. Moreover, any possible confusion as to the elements required to establish murder by deliberate premeditation was

---

[16]The defendant argues additionally that his counsel's failure to object to the prosecutor's closing argument constituted ineffective assistance of counsel. Because we discern no error in the prosecutor's statement of the law concerning deliberate premeditation, counsel could not have been ineffective for failing to object. Moreover, any misuse of Souza's out-of-court statements was minimal and was unlikely to have influenced the jury's conclusion. Thus, counsel was not ineffective for failing to object to that portion of the prosecutor's closing argument. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

remedied by the judge's final charge, which included "a correct instruction on the elements of deliberately premeditated murder." *Commonwealth* v. *Morales*, 461 Mass. 765, 784 (2012).

The defendant's claim that the prosecutor misused Souza's statements, however, has more merit. Those statements had been admitted solely to establish Souza's state of mind, and not "the truth of what was stated." *Commonwealth* v. *Magraw*, 426 Mass. 589, 594 (1998). The prosecutor's remarks could fairly be understood as instead urging the jury to conclude that the defendant had in fact behaved aggressively toward Souza prior to the killings. We are not persuaded, however, that any such misuse of the statements gave rise to a substantial likelihood of a miscarriage of justice. The remarks were subtle and fleeting, and the jury received contemporaneous and final instructions on the proper and limited purpose for which such statements were admitted. Any effect on the jury from the prosecutor's remarks concerning such statements was minimal, particularly given the overwhelming evidence otherwise admitted against the defendant, most notably his own statement to police. See *Commonwealth* v. *Emeny*, *supra* at 146.

d. *Instruction on manslaughter*. Prior to the judge's final charge, the defendant requested an instruction on voluntary manslaughter. This request was denied. During the charge, the defendant renewed his objection to the absence of a manslaughter instruction, and requested a mistrial. The objection was overruled, and the motion for a mistrial was denied.

The defendant claims that the judge erred in failing to instruct the jury on voluntary manslaughter. "It is well established that, if any view of the evidence in a case would permit a finding of manslaughter rather than murder, a manslaughter charge should be given." *Commonwealth* v. *Walden*, 380 Mass. 724, 726 (1980). "In deciding whether the evidence might have supported a manslaughter instruction, we draw all reasonable inferences in the defendant's favor." *Commonwealth* v. *Masello*, 428 Mass. 446, 449 (1998), citing *Commonwealth* v. *Nichypor*, 419 Mass. 209, 216 (1994). The judge did not err in declining to give such an instruction here.

"Voluntary manslaughter is unlawful homicide arising not from malice, but 'from the frailty of human nature,' as in a case

of 'sudden passion induced by reasonable provocation, sudden combat, or excessive force in self-defense.' " *Commonwealth* v. *Carrion*, 407 Mass. 263, 267 (1990), quoting *Commonwealth* v. *Nardone*, 406 Mass. 123, 130-131 (1989). "Reasonable provocation is provocation that 'would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint.' " *Commonwealth* v. *Acevedo*, 446 Mass. 435, 443 (2006), quoting *Commonwealth* v. *Walden, supra* at 728. See *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001) ("the jury must be able to infer that a reasonable person would have become sufficiently provoked"). Words alone are insufficient to produce the requisite passion in a reasonable person. *Commonwealth* v. *Clemente*, 452 Mass. 295, 320 (2008), cert. denied, 555 U.S. 1181 (2009). Physical contact may be, but is not necessarily, sufficient. See *Commonwealth* v. *Pierce*, 419 Mass. 28, 31 (1994), citing *Commonwealth* v. *Walden, supra*; *Commonwealth* v. *Weaver*, 395 Mass. 307, 312 (1985).

The defendant argues that the over-all, cumulative effect of the circumstances prior to the killings was sufficient to provoke a reasonable person to act as the defendant acted. The evidence, viewed in the light most favorable to the defendant, indicated that his marriage to Souza had deteriorated badly, that the financial burden on the defendant was great, that the missionaries who visited their home invaded his privacy, that Souza tried to distance the defendant from Felipe, that she insisted the defendant allow her and Caique to dominate the apartment they all shared, that she told the defendant that he had to accept everything or leave, and that if he did leave she would not allow him to take Felipe with him. Immediately prior to the killings, the defendant and Souza engaged in a heated verbal argument over her commitment to the Mormon Church. Souza stuck her finger in the defendant's face, pushed him, and tried to take their baby from his arms. She told him that she would destroy him, and then called the police. These circumstances, even when viewed as a whole, are inadequate to produce such a state of passion in an ordinary person as to eclipse his capacity for reflection or restraint. See *Commonwealth* v. *Acevedo, supra.*

The deterioration of the defendant's marriage, as well as the

other background factors fueling the defendant's frustration, began well before the killings and occurred over an extended period of time. They therefore could not have generated a "sudden passion" in the defendant that resulted in the killings. *Commonwealth* v. *Nardone, supra.* See *Commonwealth* v. *Schnopps,* 383 Mass. 178, 180 (1981), *S.C.,* 390 Mass. 722 (1984) (killing must follow provocation before sufficient time elapses for defendant's temper to cool).

The physical contact initiated by Souza on the night of the killings was minimal and not seriously threatening, especially as the defendant was physically stronger than Souza. Cf. *Commonwealth* v. *Masello, supra* at 450. Even if, as the defendant argues, Souza's conduct somehow confirmed his suspicions that she was romantically involved with visiting Mormon missionaries, the circumstances fall far short of the in-person discovery of marital infidelity that could constitute reasonable provocation. Contrast *Commonwealth* v. *Andrade,* 422 Mass. 236, 237-238 (1996) (voluntary manslaughter was possible verdict where defendant discovered his wife with another man). Finally, even if we assess the relevant factors not individually, but in combination with one another, as the defendant urges us to do, we cannot conclude that a reasonable person in these circumstances would be compelled to act as the defendant did. In sum, no view of the evidence supported a manslaughter instruction.

4. *Review pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and conclude that certain evidence was admitted in error through the testimony of the Commonwealth's DNA expert, Schneeweis.

Although, at the time of trial, Schneeweis was the acting DNA unit supervisor at the State police crime laboratory, she had previously served at that laboratory as a technical reviewer. In that capacity, she reviewed the work of analysts who processed DNA samples, ensuring that all protocols were followed and that all results were technically accurate. Schneeweis served as technical reviewer for the work of the analyst who processed the "unknown" samples of DNA recovered from the crime scene and from the defendant's clothing and person. Schneeweis did not, however, serve as technical reviewer for the work performed by a different analyst who processed the "known"

DNA samples of the defendant and the two decedents. Nonetheless, Schneeweis testified on direct examination, without objection, to the contents of charts, themselves admitted in evidence, depicting test results for both the known and unknown samples. This was improper.

An expert may not testify on direct examination to test results of which she does not have personal knowledge, even where her expert opinion is based on such results. See *Commonwealth* v. *Greineder*, 464 Mass. 580, 584, 593-594 (2013). Even if, as technical reviewer, Schneeweis can be said to have personal knowledge of the test results for the "unknown" DNA samples, a point we need not decide, she plainly did not have the requisite personal knowledge of the "known" DNA samples depicted on one of the charts. Neither such charts nor her testimony concerning its contents should have been admitted.

This error, however, did not give rise to a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Emeny*, 463 Mass. 138, 145 (2012). Schneeweis's opinion as to the various matches between the "known" and "unknown" DNA samples was admitted properly. See *Commonwealth* v. *Barbosa*, 457 Mass. 773, 783-784 (2010), cert. denied, 131 S. Ct. 2441 (2011) ("Where a Commonwealth expert testifies to her own opinion, the opinion is not hearsay, because the declarant of the opinion is testifying at trial. . . . Similarly, because the defendant may confront the declarant of the opinion through cross-examination, the defendant is not deprived of his right of confrontation"). There was ample other evidence to establish the killer's identity, including the defendant's statement to police, and we are confident that, even if Schneeweis's testimony had been excluded, "the jury verdict would have been the same." *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998). Neither this error nor our review of the remainder of the record provides any basis for granting extraordinary relief.

*Judgments affirmed.*