NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11571


COMMONWEALTH  vs.  THE NGOC TRAN.



Middlesex.     December 5, 2014. - April 10, 2015.

Present:  Gants, C.J., Spina, Cordy, Duffly, & Lenk, JJ.


Homicide.  Assault and Battery by Means of a Dangerous Weapon.
    Constitutional Law, Admissions and confessions,
    Voluntariness of statement.  Evidence, Admissions and
    confessions, Voluntariness of statement.  Mental
    Impairment.  Practice, Criminal, Admissions and
    confessions, Voluntariness of statement, Instructions to
    jury, Duplicative convictions, Jury and jurors, Conduct of
    juror, Capital case.  Jury and Jurors.




    Indictments found and returned in the Superior Court
Department on June 16, 2011.

    The cases were tried before David Ricciardone, J.


    Stephen Neyman for the defendant.
    Michael A. Kaneb, Assistant District Attorney, for the
Commonwealth.


    CORDY, J.  On April 28, 2011, Son Ngoc Tran was found dead

in her home.  The cause of her death was multiple blunt-impact

injuries to her head and brain inflicted by a rubber-headed

mallet.  Dispatched to the scene to investigate, Lowell police officers discovered the victim in a pool of blood in her bathroom and her husband, the defendant, sobbing in the living room.  As one officer approached, the defendant raised his hands and said, "I killed my wife."

The defendant was charged with murder in the first degree and assault and battery by means of a dangerous weapon on a person sixty years of age or older.  He filed a motion to suppress statements he made in an interview with police investigators shortly after his arrest, which was denied following an evidentiary hearing.  At trial, the Commonwealth proceeded with respect to the murder charge on theories of deliberate premeditation and extreme atrocity and cruelty.  The defense was not lack of criminal responsibility, but the defendant's lack of the mental capacity to specifically intend his actions or to act in a cruel or atrocious manner.  A Middlesex County jury found the defendant guilty on both charges.[1]

On appeal, the defendant claims several errors.  We reject each contention and find no reversible error arising from the

---

[1] The defendant was sentenced consecutively for a term of life without the possibility of parole on the conviction of murder in the first degree, and to a sentence of not less than nine and not more than ten years on the conviction of assault and battery by means of a dangerous weapon on a person sixty years of age or older.

defendant's various claims.  Further, we conclude that there is no basis for exercising our authority under G. L. c. 278, § 33E, to reduce the verdict of murder to a lesser degree of guilt or order a new trial.  Accordingly, we affirm the defendant's convictions.

Background.  We recite the facts in the light most favorable to the Commonwealth, reserving certain details for our analysis of the issues raised on appeal.

At approximately 7 P.M. on April 28, 2011, the defendant called Man Le,[2] a family friend, and asked her to come to his house the following day with his son, McKinley Tran.  There was nothing unusual in the defendant's tone of voice, and when Man asked the defendant why he wanted her to visit he told her, "It's a secret."  The defendant also called McKinley directly and asked him to come to his house the next day, stating, "You will find out [why] when you come over."

Sometime after these telephone calls, the defendant entered the bathroom of the home he shared with the victim in Lowell, armed with a metal-shafted, rubber-headed hammer.  The defendant proceeded to use the mallet to attack the victim with repeated blows to her head.  After the victim was knocked to the floor, the defendant continued to strike her with the hammer on her

---

[2] Where appropriate the defendant's family members and family friend are referred to by their first names given their common last names.

face, skull, neck, arms, and legs until she was dead. The attack caused fractures to her skull, eye sockets, and cheekbones, multiple contusions to her brain, and numerous other injuries to her arms, legs, and extremities. Each of these injuries was inflicted while the victim was still alive.

At approximately 9 P.M., the defendant telephoned Man a second time and said, "I killed her dead." He then asked Man to inform his son of this by telephone. At this point, the defendant's voice sounded "different," and he instructed Man, "[C]all the police. Come cuff me." He explained that he attempted to report the murder at a nearby police station, but it was closed.

Alerted by Man, McKinley and his wife, Chan Le,[3] drove to the defendant's house and arrived shortly after 9 P.M. On entering the house, Chan found the defendant sitting on the living room couch. The defendant was surrounded by several chairs, which bore hand-lettered signs in both English and Vietnamese warning of the risk of electric shock. The victim was found dead on the bathroom floor. There was blood all over the bathroom, as well as on the defendant's pants, shirt, face, and hands. The defendant told Chan that he had killed the victim and asked not to be touched because he was "someone with guilt."

---

[3] Chan Le is also the niece of Man Le.

The defendant had planned to kill himself after killing the victim. He had written his children a five-page letter, blaming the victim for treating him poorly and for "heartlessly shatter[ing] the happiness of [the] family." He wrote, "Now the time has come for me to leave and take this wife with me. . . ." The remainder of this letter provided his children with details concerning the family automobiles and bank accounts. After killing the victim, the defendant wrapped the exposed ends of an electrical cord, which he had previously spliced open, around his two thumbs, and plugged the cord into an electrical outlet. He received minor burns to his skin.

Lowell police Officer Philip Valliant and his partner were dispatched to the scene at approximately 9:30 P.M. They found the defendant, still seated on the living room couch, sobbing. When Officer Valliant approached the defendant, he raised his hands and told Officer Valliant, "I killed my wife. I killed my wife." The defendant was placed under arrest and instructed to walk to the kitchen and sit while the officers awaited the arrival of additional police officers and medical personnel. The defendant complied with these instructions and appeared "calm" and "rational."

The defendant insisted that the victim did nothing to provoke him on the night of the killing. Rather, he admitted to killing her out of a deep hostility that developed over the

course of their long and unhappy marriage. The victim and the defendant, both immigrants from Vietnam, were married for more than thirty years at the time of the killing. Throughout their marriage, the defendant verbally and mentally abused the victim. In the weeks leading up to the killing, the defendant and the victim faced particular financial strain. Moreover, the defendant was convinced that the victim was "poison[ing] the minds of [his] children" against him and blamed her for causing him "endless suffering and anguish." On the day of the killing, the victim had announced to the defendant, their children, and her friend that she was leaving him.

Discussion. 1. Miranda waiver. The Commonwealth presented evidence at trial that the defendant, after being transported to the Lowell police station, agreed to speak with Lowell police Sergeant Joseph Murray and State police Trooper Erik Gagnon. Sergeant Murray began advising the defendant of the Miranda rights by reading from the Lowell police department's preprinted Miranda advisement and waiver form. Although the defendant had told the officers that he understood them and read and spoke English, at some point it became apparent that the defendant, a native Vietnamese speaker, had some difficulty responding to Sergeant Murray's questions in English. Sergeant Murray asked the defendant if he would like the assistance of a Vietnamese translator, to which the

defendant indicated he would. At this point, the interview stopped. After a series of telephone calls, Sergeant Murray was able to obtain translation assistance from two Boston police officers, Diep Nguyen and Hoang Nguyen.

With the assistance of both a written Miranda advisement printed in Vietnamese and a running translation provided by the Boston police officers, the defendant was provided with complete Miranda warnings both in English and Vietnamese. After Sergeant Murray read each of the enumerated warnings in English, the two Boston police officers asked the defendant, who was consulting the written Vietnamese translation, to confirm that he understood Sergeant Murray's warning, either by asking the defendant to explain the warning to them in Vietnamese or by restating the warning in Vietnamese and asking if the defendant understood. On cross-examination at trial, Officer Diep Nguyen acknowledged that these translations from English to Vietnamese were "probably . . . not word for word."[4] After receiving his Miranda warnings, the defendant signed the Vietnamese language

---

[4] At trial, the only discussion of the distinctions between the English and Vietnamese advisements was on cross-examination of Boston police Officer Diep Nguyen. For example, Officer Nguyen testified that the English on the Lowell police department form states, "You have the right to remain silent," whereas the translated Vietnamese form states, "You have the right to remain silent, which means you don't have to answer any questions."

form, which indicated that he understood his rights, and told the officers that he would speak with them.

In the approximately forty-minute recorded interview that followed, the defendant gave Sergeant Murray and Trooper Gagnon a detailed account of the killing. He again admitted to killing his wife by hitting her in the head "[m]any times" with a hammer. He explained to the officers how he stopped his attack at one point to muffle the victim's cries with toilet paper, and then resumed. The defendant explained to the officers how many years of unhappiness led him to "plan[] to kill [the victim] and then commit suicide."

The judge instructed the jury, both when the recording was played at trial and in his final charge, that they could consider the defendant's statements only if the Commonwealth had proved the voluntariness of the statements beyond a reasonable doubt. The judge did not instruct the jury that they should specifically consider whether the defendant's Miranda waiver was valid. As the defendant did not request such an instruction, and did not object to the form of the humane practice instruction the judge issued, we review this claim to determine whether any error created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Sunahara, 455 Mass. 832, 836 (2010).

The defendant contends that it was error for the jury not to be explicitly instructed that when considering whether to accept the defendant's statements as evidence under the humane practice rule, see Commonwealth v. Tavares, 385 Mass. 140, 149-153, cert. denied, 457 U.S. 1137 (1982), they were entitled to evaluate the validity of his Miranda waiver as a factor.  In Tavares, we explained that, "[o]ur humane practice requires that when statements amounting to a confession are offered in evidence, the question whether they were voluntary is to be decided at a preliminary hearing in the absence of the jury. . . . If the judge decides that they are admissible, he should then instruct the jury not to consider the confession if, upon the whole evidence in the case, they are satisfied that it was not the voluntary act of the defendant" (citations and quotations omitted).  Id. at 149-150.  The defendant grounds his argument in a footnote in Tavares in which we explained that evidence bearing on whether Miranda warnings were properly given and waived is relevant to the determination whether a defendant's confession was voluntary and therefore may be considered by the jury when making its over-all evaluation.  Id. at 153 n.19.  We find the defendant's argument unpersuasive.

In Commonwealth v. Cryer, 426 Mass. 562, 572 (1998), we rejected the argument that a judge is obligated to instruct the jury on specific factors they should consider when assessing

voluntariness. Moreover, "[i]n determining the propriety of a jury instruction, we must consider the instruction in the context in which it was delivered, in order to determine its probable effect on the jury's understanding of their function." Id. Here, the judge, both when the recording of the interview was played and in his final charge, detailed various factors the jury could consider in their determination whether the defendant's statements were voluntary, including "the nature of the conversations" the defendant had with the police, as well as whether the defendant was "confused to any extent" at the time of the interview. Additionally, the evidence presented at trial, especially defense counsel's cross-examination of Officer Diep Nguyen, "made clear to the jury what factors they should consider in weighing whether the defendant's statements were voluntary." Id. Further, the judge instructed the jury repeatedly to consider the "totality of the surrounding circumstances." These instructions exceeded the minimum required under Cryer, and provided sufficient direction for a reasonable jury to disregard the defendant's statements if they had a reasonable doubt about the voluntariness of his statements.

The defendant's argument rests on his contention that an instruction directing the jury to consider the validity of his Miranda waiver would have led them to consider that the

Vietnamese translation of the Miranda advisements did not track the English advisements "word for word," thereby casting real doubt on the voluntariness of his statement. As an initial matter, we note that the judge found that the defendant understood his Miranda rights prior to making his statement to the police, and we discern no error in this finding. In any event, while "[t]he four warnings Miranda [v. Arizona, 384 U.S. 436, 444-445 (1966),] requires are invariable," the United States Supreme Court "has not dictated the words in which the essential information must be conveyed." Florida v. Powell, 559 U.S. 50, 60 (2010). See California v. Prysock, 453 U.S. 355, 359 (1981) ("no talismanic incantation" required to satisfy Miranda's strictures). "[R]eviewing courts are not required to examine the words employed 'as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by Miranda."'" Powell, supra at 60, quoting Duckworth v. Eagan, 492 U.S. 195, 203 (1989). See Commonwealth v. Bins, 465 Mass. 348, 358 (2013) ("No prescribed set of words must be used to provide the [Miranda] warnings . . ." [citation omitted]).

There is nothing to indicate that this standard was not satisfied here, as the four essential Miranda warnings were

reasonably conveyed to the defendant in his native language.[5] The sufficiency of this translation is not diminished by the fact that the precise Vietnamese words employed did not completely mirror their English counterparts. See Bins, 465 Mass. at 362-363 (waiver voluntary where Portuguese translation that varied from precise English advisement still adequately conveyed required warnings). Here, no warning was omitted from either recitation and none was "misstated to the point of being contradictory." Id. at 363. Where the defendant has not shown a substantive deficiency in the warnings he received, and the four required warnings were reasonably conveyed in the defendant's native language before he agreed to speak with the police, the fact that the Vietnamese translation did not track the English warnings "word for word" is of no legal consequence. The totality of the circumstances demonstrates that the defendant was advised of his rights in a meaningful way and voluntarily waived them, and, in any event, the judge's instructions on the issue of voluntariness did not give rise to a substantial likelihood of a miscarriage of justice.[6]

---

[5] Specifically, the defendant was advised that he had a right to remain silent, anything he said may be used against him, he had a right to speak to an attorney, and if he could not afford an attorney one would be appointed for him.

[6] Although we conclude that there was no substantial likelihood of a miscarriage of justice in this case, a judge's humane practice instruction should ordinarily advise the jury

2. <u>Mental impairment instruction</u>. The defendant also argues that the judge provided deficient instructions regarding his defense of mental impairment. More specifically, he contends that the instructions failed to define "mental impairment," and failed to sufficiently emphasize the Commonwealth's burden of proof.[7] Yet, the model jury instructions on homicide do not include a definition of the term "mental impairment." We have also not required or offered such a definition. "'All that we have ever required' be said to juries about the effect of mental impairment on a defendant's intent or knowledge is 'satisfied by a simple instruction that the jury may consider credible evidence' of the mental impairment 'in deciding whether the Commonwealth had met its

---

that among the many factors they may consider in determining whether a statement allegedly made by the defendant is voluntary is whether the Miranda warnings were given to and understood by the defendant.

[7] In his brief, the defendant quotes extensively from the model jury instruction on lack of criminal responsibility, yet he does not contend that the judge should have given such an instruction. See <u>Commonwealth</u> v. <u>Urrea</u>, 443 Mass. 530, 535 (2005) (explaining distinction between mental impairment doctrine and test regarding lack of criminal responsibility). Although some of the defense expert's testimony arguably supported a defense of lack of criminal responsibility, such an instruction was not required, as it was not requested. See <u>Commonwealth</u> v. <u>Johnson</u>, 422 Mass. 420, 424 (1996) ("Such an instruction must be given if requested and supported by the evidence"). Moreover, the defendant did not argue lack of criminal responsibility in his closing argument. Finally, the judge specifically asked defense counsel to confirm that she was "not asking for an instruction on criminal responsibility," to which she responded in the affirmative.

burden of proving the defendant's state of mind beyond a reasonable doubt.'" Commonwealth v. Mercado, 456 Mass. 198, 207 (2010), quoting Commonwealth v. Sires, 413 Mass. 292, 300 (1992).

Here, four times during his final charge, the judge instructed the jury that they could consider "any credible evidence" that the defendant suffered from a mental impairment in determining whether the charges had been adequately proven against him.[8]  Twice, the judge also reminded the jury of the Commonwealth's burden of proof, which he discussed at length in the general portion of his instructions.  These instructions mirrored the model jury instructions on homicide, as well as the instructions requested by the defendant, and they appropriately explained the relationship between the Commonwealth's burden of proof and the defendant's defense of mental impairment.

Moreover, in assessing the adequacy of the language employed in a jury charge, "we consider the jury charge as a whole, looking for the interpretation a reasonable juror would place on the judge's words" (citation and quotation omitted). Commonwealth v. Harbin, 435 Mass. 654, 658 (2002).  Here, we

---

[8] The judge gave this instruction once when addressing the intent required for a conviction of murder in the first degree on a theory of deliberate premeditation, twice when addressing the intent required for a conviction of murder on a theory of extreme atrocity or cruelty, and once more when addressing the intent required for a conviction of murder in the second degree.

cannot say that the term "mental impairment" is so obscure that a reasonable jury would be unable to rely on the usual and accepted meanings of these words to determine whether the defendant was capable of informing the required intent. Further, the jury heard testimony from two expert witnesses regarding the defendant's claim of mental impairment and his capacity to intend his actions at the time of the murder. Accordingly, it was not error for the judge to leave the term "mental impairment" undefined.

Last, the judge was correct to abstain from stating that the Commonwealth must prove beyond a reasonable doubt that the defendant was not mentally impaired. Evidence of impairment is a "mere subsidiary fact[] that the jury consider in sifting the circumstantial evidence as to [the defendant's] mental state." Mercado, 456 Mass. at 207, quoting Commonwealth v. Waite, 422 Mass. 792, 805 (1996). There is "no requirement that the jury find these subsidiary facts and inferences beyond a reasonable doubt." Waite, supra at 806. In sum, the judge's instruction on mental impairment, particularly in light of the substantial evidence offered to demonstrate the defendant's criminal intent, did not give rise to a substantial likelihood of a miscarriage of justice.

3. Duplicative convictions. The defendant additionally contends that his convictions of murder and assault and battery

by means of a dangerous weapon on a person sixty years of age or older were duplicative.  The defendant's argument relies on a theory that convictions are duplicative if they arise out of a single criminal episode.  We considered and rejected this theory in Commonwealth v. Vick, 454 Mass. 418, 430-436 (2009), and the defendant's reliance on pre-Vick case law is misplaced.  In Vick, the defendant was convicted of, among other things, assault and battery by means of a dangerous weapon causing serious bodily injury and armed assault with intent to murder. Id. at 419.  He argued that "the two offenses were so closely related in fact as to constitute in substance but one crime." Id. at 430-431.  There, while recognizing that a series of cases provided some support for the view on which this argument rested, see id. at 433-434, we ultimately rejected this theory of merger and "affirmed the traditional elements-based approach."  Commonwealth v. McCoy, 456 Mass. 838, 853 (2010). See Vick, supra at 431.  Moreover, in Commonwealth v. Anderson, 461 Mass. 616, 632-634, cert. denied, 133 S. Ct. 433 (2012), we invoked Vick to explicitly overrule Commonwealth v. Santos, 440 Mass. 281, 293-294 (2003), a case on which the defendant's brief and theory of merger substantially relies.

In Vick, 454 Mass. at 431, we explained, "[an] elements-based approach remains the standard for determining whether multiple convictions stemming from one criminal transaction are

duplicative."  See Morey v. Commonwealth, 108 Mass. 433, 434-436

(1871).  "As long as each offense requires proof of an

additional element that the other does not, neither crime is a

lesser-included offense of the other, and convictions on both

are deemed to have been authorized by the Legislature and hence

not [duplicative]" (citation and quotation omitted).  Vick,

supra at 431.[9]  See Commonwealth v. Torres, 468 Mass. 286, 288-

289 (2014) (following Vick); Commonwealth v. Johnson, 461 Mass.

44, 52 (2011) (same).[10]

As the defendant recognizes, under an elements-based

approach, each of his convictions requires proof of an element

not required by the other:  murder requires, among other things,

the death of the victim; the assault and battery charge requires

---

[9] As explained in Commonwealth v. Vick, "[t]he question
whether two offenses are 'so closely related in fact as to
constitute in substance but a single crime' . . . becomes
pertinent in a single criminal proceeding where one crime is a
lesser included offense of the other, or where there are
multiple counts of the same offense."  454 Mass. 418, 435
(2009), quoting Commonwealth v. St. Pierre, 377 Mass. 650, 662-
663 (1979).

[10] A distinct merger rule is available in felony-murder
cases.  See Commonwealth v. Gunter, 427 Mass. 259, 275-276
(1998), S.C., 456 Mass. 1017 (2010), and S.C., 459 Mass. 480,
cert. denied, 132 S. Ct. 218 (2011); Commonwealth v. Berry, 420
Mass. 95, 113-114 (1995).  The defendant was not convicted of
murder on a felony-murder theory, and "[w]e decline to
categorize this case as one of the 'rare circumstances where the
purposes of our lesser included offense jurisprudence are not
served by a strict application of the [elements-based]
doctrine."  Commonwealth v. Torres, 468 Mass. 286, 290 n.5
(2014), quoting Commonwealth v. Porro, 458 Mass. 526, 532
(2010).

a touching of the victim with a deadly weapon and that the victim was sixty years of age or older, neither of which is required to prove murder under any theory.  See G. L. c. 265 § 15A (a); Commonwealth v. Campbell, 375 Mass. 308, 312 (1978).  "Neither crime is a lesser included offense of the other, and, therefore, the Legislature has authorized punishment for both."  Vick, 454 Mass. at 433.  See Morey, 108 Mass. at 434-436.  Accordingly, the defendant's convictions and sentences were not duplicative and did not result in a substantial likelihood of a miscarriage of justice.

4.  Sleeping juror.  The Commonwealth noticed that one of the jurors appeared to be sleeping during presentation of the video recording of the defendant's police interview, and the judge noticed that this same juror appeared to be sleeping during a portion of the jury charge.  The judge suggested potential remedies at sidebar prior to the jury's deliberation, and the defendant's trial counsel, deferring to the judge, requested that the juror be made an alternate.  The judge instructed the clerk to do so.  On appeal, the defendant argues that this decision violated the statute concerning alternate jurors, which provides that "the court shall direct the clerk to place the names of all of the available jurors except the foreperson into a box . . . and to select at random the names of the appropriate number of jurors necessary to reduce the jury to

the proper number of members required for deliberation in the particular case."  G. L. c. 234A, § 68.

This argument is unavailing.  While the nonrandom selection of the juror as an alternate was irregular, the applicable statute specifically states that such an irregularity "shall not be sufficient . . . to set aside a verdict . . . unless the objecting party has been specially injured or prejudiced thereby."  G. L. c. 234A, § 74.  While it may have been better practice for the judge to conduct a hearing to determine definitively whether the juror had been asleep and to what extent the juror was no longer capable of deliberating, see Commonwealth v. McGhee, 470 Mass. 638, 643-646 (2015),[11] the

---

[11] On the second day of evidence, the Commonwealth notified the judge that the juror in question had closed his eyes "for a matter of just [a] couple of seconds" while viewing the video recording of the defendant's police interview.  Defense counsel agreed with the Commonwealth's assessment.  At the close of the trial, the judge told counsel that the same juror appeared to have been sleeping during a part of his jury charge.  He stated that the juror had "the appearance that he was falling asleep" during "some key portions," but noted that he "can't be in [the juror's] head and make the absolute conclusion that [the juror] was in fact sleeping, -- he could have had his eyes closed and still listened."  In Commonwealth v. McGhee, 470 Mass. 638, 644 (2015), we explained that "[i]f a judge reaches a preliminary conclusion that information about a juror's inattention is reliable, the judge must take further steps to determine the appropriate intervention.  Typically, the next step is to conduct a voir dire of the potentially inattentive juror."  However, "not every complaint regarding juror attentiveness requires a voir dire," Commonwealth v. Beneche, 458 Mass. 61, 78 (2010), and "[j]udges have substantial discretion in this area."  McGhee, supra at 644.  Here, the judge had a reliable basis to believe the juror had been asleep, and the lack of such a

defendant did not object at trial, and there is no indication that the designation of the sleeping juror as an alternate amounted to a substantial likelihood of a miscarriage of justice.  Conversely, "[i]t is obviously not in the interest of justice to have a juror deliberate who has not heard the evidence or parts of the judge's charge."  Commonwealth v. Stokes, 440 Mass. 741, 751 (2004), S.C., 460 Mass. 311 (2011), (proper for judge to dismiss "dozing" juror to prevent participation in deliberations); United States v. Bradley, 173 F.3d 225, 230 (3d Cir.), cert. denied, 528 U.S. 963 (1999) (judge "had a legitimate basis to dismiss [snoring juror] . . . [and] had sufficient information to support the dismissal and so did not have to voir dire her").

The defendant argues that the judge's action effectively discharged the sleeping juror.  We disagree, as an alternate remains available to replace a deliberating juror should the need arise.  Nevertheless, "[a] judicial observation that a juror is asleep . . . requires prompt judicial intervention," and "[t]he judge has discretion regarding the nature of the intervention" (citations and quotations omitted).  Commonwealth v. Beneche, 458 Mass. 61, 78 (2010).  "The burden is on the

---

hearing is most problematic in cases in which a judge, despite being alerted to a significant problem of jury attentiveness, takes no action.  See id. at 645-646; Commonwealth v. Braun, 74 Mass. App. Ct. 904, 905-906 (2009).  Such was not the case here, as the juror did not deliberate.

defendant to show that the judge's decision in the matter was 'arbitrary or unreasonable.'"  Id., quoting Commonwealth v. Brown, 364 Mass. 471, 476 (1973).  In the instant case, the defendant has presented no evidence to meet this burden.  In fact, he takes no position on whether the juror should have been dismissed or permitted to deliberate.  He only takes issue with the juror being given the label of "alternate."  We cannot say, given that the judge and both parties observed that the juror appeared to be asleep at two distinct and key portions of the trial, that the judge's decision was "arbitrary or unreasonable," see Brown, supra, or that he abused his discretion in designating the juror as an alternate.  See Beneche, supra.  Accordingly, where the judge had both discretion in choosing the remedy best suited to address the situation and ample grounds to justify action, designating the sleeping juror as an alternate did not amount to a substantial likelihood of a miscarriage of justice.

5. G. L. c. 278, § 33E.  We have reviewed the entire record of the defendant's trial pursuant to G. L. c. 278, § 33E, and we find no reason to exercise our authority to reduce the jury's verdict of murder to a lesser degree of guilt or order a new trial.

Judgments affirmed.