NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12562

COMMONWEALTH  vs.  PEDRO VASQUEZ.


Hampden.     December 6, 2018. - August 28, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, & Kafker, JJ.


Homicide.  Identification.  Due Process of Law, Identification. Constitutional Law, Identification, Admissions and confessions, Voluntariness of statement, Search and seizure, Probable cause.  Evidence, Identification, Bias, Admissions and confessions, Voluntariness of statement. Witness, Bias.  Fair Trial.  Cellular Telephone.  Probable Cause.  Search and Seizure, Fruits of illegal search, Affidavit, Probable cause.  Practice, Criminal, Motion to suppress, Fair trial, Admissions and confessions, Voluntariness of statement, Interlocutory appeal.


Indictments found and returned in the Superior Court Department on April 30, 2015.

Pretrial motions to suppress statements, to suppress the results of an allegedly consensual search of a cellular telephone, to suppress statements and evidence derived from an incorrect statement of rights, and to suppress out-of-court identifications were heard by John A. Agostini, J.; and a pretrial motion to suppress the seizure of the defendant's cellular telephone and the information extracted from it was heard by Richard J. Carey, J.

Applications for leave to prosecute interlocutory appeals were allowed by Budd and Lowy, JJ., in the Supreme Judicial

Court for the county of Suffolk, and the appeals were reported by them to the Appeals Court.  After consolidation of the appeals, the Supreme Judicial Court granted an application for direct appellate review.

Maximilian J. Bennett, Assistant District Attorney (Katherine E. McMahon, Assistant District Attorney, also present) for the Commonwealth.

Merritt Schnipper for the defendant.

LENK, J.  Following the January 2015 shooting death of the defendant's girlfriend, the defendant quickly became the primary suspect.  He was arrested after three members of the victim's family identified him from surveillance audio and video footage taken from a private house across the street from the shooting.  After officers arrested the defendant, and sought to question him, they attempted to advise him of his Miranda rights.  It became apparent that the defendant did not have much command of the English language.  The detectives asked a Spanish-speaking officer, who was untrained in interpretation, to translate the Miranda warnings and the interrogation into Spanish.  Based on the officer's rendering of the Miranda warnings, the defendant ostensibly waived his rights and spoke with police.  He also provided officers, on their request, with the passcode to unlock the cellular telephone they had seized from him upon arrest, and gave them permission to search it.  Police later used that information to obtain a warrant for the cell site location information (CSLI) for the defendant's telephone.

The defendant was indicted on charges of murder in the first degree and two related firearms offenses. In a series of motions, he moved to suppress the witnesses' identifications of him from the surveillance footage, his statements to police, evidence obtained from the search of his cellular telephone, and the CSLI. A judge of the Superior Court (first motion judge) denied the motions as to the identifications and the search of the telephone. The judge allowed the motions with respect to the custodial statements. A different Superior Court judge (second motion judge) denied the motion to suppress the CSLI.

The Commonwealth sought interlocutory review of the order suppressing the defendant's statements, and the defendant sought review of the denial of his various motions to suppress. Single justices of this court allowed the petitions, and the cross appeals were consolidated. We subsequently allowed the defendant's application for direct appellate review.

We discern no error in the decision that the identifications do not require suppression. We also agree that the translation of the Miranda warnings into Spanish was inadequate to apprise the defendant of his rights, and that the defendant's limited comprehension of English did not suffice to compensate for these deficiencies. Because the search of the defendant's cellular telephone arose from the statements he made following those incomplete warnings, the evidence obtained as a

result must be suppressed.  We conclude also that, when the tainted information is excised from the search warrant application for the CSLI, the affidavit does not establish probable cause to access the CSLI for the defendant's device. Accordingly, the order on the motion to suppress the CSLI shall be reversed.

1.  Background.  The following facts are drawn from the first motion judge's findings on the motions to suppress concerning the identifications, the Miranda warnings, and the search of the cellular telephone.  The facts are supplemented, as relevant, with uncontroverted testimony implicitly or explicitly credited by the judge, in support of his findings, after evidentiary hearings.[1]  See Commonwealth v. Jones-Pannell, 472 Mass. 429, 437 (2015).  As to the motion to suppress involving the CSLI, the facts are drawn from the affidavit in support of the application for a search warrant.  See Commonwealth v. Perkins, 478 Mass. 97, 99 (2017).

---

[1] An evidentiary hearing was conducted over four days on the motions to suppress the identifications, custodial interrogation, and initial search of the cellular telephone.  At that hearing, the first motion judge heard testimony from Abigail Martinez Melende; the victim's son, brother, and father; and a Springfield police officer, with respect to the identification procedures.  Testimony was also introduced from a police officer and an expert witness concerning the custodial interrogation and the search issues.  A nonevidentiary hearing was conducted by the second motion judge on the motion to suppress the cell site location information (CSLI).

a. <u>Identifications</u>. In January of 2015, police officers discovered the victim's body inside a parked sport utility vehicle (SUV); she had been shot in the head. The investigating officers noted a surveillance camera on a building located across the street from the SUV. The black and white footage, while dark, captured the shooting. It shows the SUV stopping at the curb and parking. After a few moments, the rear passenger door on the driver's side of the vehicle opens. An argument, in Spanish, can be heard emanating from the individuals inside the vehicle. A single gunshot is heard, and a man is seen getting out of the vehicle and running off camera.

Based on this footage, police wanted to identify promptly the individual who could be seen and heard on the audio-video recording. Officers first went to the home of the victim's brother, Martino Diaz.[2] His girlfriend, Abigail Martinez Melende, also was present. Police told the two that a vehicle registered to Martinez Melende had been involved in a shooting and that police had some questions for them. Diaz and Martinez Melende drove together to the police station to be questioned.

---

[2] A pseudonym.

They both surmised that the victim had been shot.[3]  They also speculated that the defendant had been involved.[4]

At some point, Diaz contacted his father, who immediately went to collect the victim's then teenage son, Juan Mendoza,[5] from school.  As with the other members of his family, the victim's son was aware that a shooting had occurred and, before talking to police, harbored a similar suspicion that the defendant had harmed his mother in some way.[6]  The victim's son and his grandfather drove to the police station together; when they arrived, Diaz told them that he believed the defendant may have killed the victim.

Each witness was then interviewed separately by police. Each witness was shown a photograph of the defendant and was asked whether that person was the victim's boyfriend, whom Diaz and Martinez Melende had mentioned to the police earlier.  The witnesses agreed that the photograph showed the victim's boyfriend.

---

[3] Diaz's neighbor had seen a news report of the shooting, and told Diaz and Martinez Melende, as they were leaving for the police station, that a woman had been killed.

[4] Diaz and Martinez Melende also were aware that there was a history of domestic violence between the defendant and the victim over the years.

[5] A pseudonym.

[6] Mendoza also had seen a news report that the vehicle his mother drove had been involved in a shooting.

Police then had the witnesses attempt to make an identification from the surveillance footage.[7] First, they had each witness listen to the audio segment of the recording, without displaying the video portion, to determine if anyone could recognize the voices of the individuals in the vehicle; each listened to the recording separately. The recording was stopped immediately prior to the sound of a gunshot. Diaz, Mendoza, and Martinez Melende each identified the voices as belonging to the victim and the defendant.[8]

After listening to the audio recording, each witness was shown the video recording, without the accompanying audio, to determine whether the witness could identify the individual who got out of the vehicle and ran down the street.[9] As with the audio recordings, the witnesses were separated throughout this process. Although the video recording is too indistinct to display any facial features, all three witnesses believed that the individual seen leaving the vehicle and running down the street was the defendant.

---

[7] The victim's father did not participate in the identification procedure.

[8] Diaz was able to make a voice identification, in part, because the victim purportedly mentioned the defendant's name twice during the argument.

[9] The witnesses were shown only the portion of the video recording that began after the sound of the gunshot.

Diaz reported that he believed the individual was the defendant based on "his sneakers," "his voice," and "the way he is," and because the victim "mentioned his name two times."[10] Mendoza expressed a belief that the defendant was the individual depicted in the videotape based on the clothing and the way in which he moved. Martinez Melende reported that she believed that the individual was the defendant based on his "size, body type, weight and height," as well as his sneakers.

The police did not suggest to the witnesses that the defendant was a suspect, and none of the witnesses was permitted to speak to any of the others until after each witness had made an identification.[11]

b. _Interrogation_. Shortly after the identifications, the defendant was arrested and brought to the Springfield police station. During the subsequent interrogation, one of the detectives attempted to inform the defendant that he had been arrested for the murder of the victim and for firearms violations relating to her death. The detective also attempted

---

[10] Although Diaz did not listen to the audio portion while he viewed the video footage, his statements make clear that he understood the two segments were connected.

[11] It appears as though the witnesses spoke to each other before arriving at the police station and while waiting at the police station; at these points, none of the witnesses had made an identification from either the audio or video portions of the surveillance tape.

to advise the defendant of his Miranda rights.  Because the defendant was illiterate in English and Spanish, the officers understood that the defendant would need the Miranda warnings explained to him orally.  They also understood that, because the defendant did not appear to have much command of English, they had to deliver the warnings in Spanish, the defendant's native language.  One of the officers, who was not formally trained as an interpreter, translated the warnings as follows:

> "1.  You have the right to remain quiet.
>
> "2.  Any thing that you say can be against you . . . the, of the court.
>
> "3.  You the right to consult with a lawyer for advice before being and to have him present with you during the interrogation.
>
> "4.  If you do not have the means to pay, to pay a, and if you wish for it, you the right to be a law, lawyer before being interrogated.
>
> "5.  If you decide to be now, without the presence of a lawyer, you still have the right to stop the, that any moment until you talk with a lawyer."[12]

Police subsequently directed the defendant to initial each of the warnings on a printed Miranda form written in English.  He did so.

---

[12] The first motion judge "accept[ed] this transcription and translation as the official and accurate version of the conversation between and among the participants to the interview."

During the course of the interview, the defendant consistently denied his involvement, even as officers became "confrontational and accusatory" in their questioning. As the interview drew to a close, the defendant told officers that they "could check" many of the details surrounding his account because they had his cellular telephone. At that point, police asked, in English, if they could search the device, and expressed some confusion whether they or the defendant were in possession of the device. The defendant gave them "verbal permission" to search the device.[13]

c. Search warrant for CSLI. When police searched the defendant's cellular telephone, they "extracted" the incoming and outgoing telephone calls, incoming and outgoing text messages, incoming and outgoing multimedia messages, contact information, and photographs and video recordings on the device.

Approximately ten days after that search, police applied for a warrant to obtain the CSLI data for the device.[14] In

---

[13] When the officers asked if they or the defendant were in possession of his cellular telephone, he responded that they had it. Officers then asked if they could search the device, and the defendant responded, "Si." The officer who was interpreting followed up in Spanish, "You understand what he say? They can take your phone in order, to search the phone?" The defendant responded, in Spanish, "Yes, they can search."

[14] "The term ['CSLI'] refers to a cellular telephone service record or records that contain information identifying the base station towers and sectors that receive transmissions from a [cellular] telephone" (quotation and citation omitted).

support of the warrant request, the affidavit described the evidence that police had gathered, which included the witnesses' identifications of the defendant from surveillance footage and a history of domestic violence. The affidavit also noted that a cellular telephone was recovered from the defendant when he was arrested at his house, and described information obtained from the police search of that device, namely, the defendant's telephone number.[15] Based on this evidence, police requested all CSLI for the thirty-two days from December 5, 2014, through January 5, 2015, the month immediately preceding and including the day on which the victim was killed. A warrant for the requested information was issued.

d. Suppression hearings. In April of 2017, the first motion judge held an evidentiary hearing concerning the motions to suppress the defendant's statements, the identifications, and the initial search of the cellular telephone. The judge then

---

Commonwealth v. Augustine, 472 Mass. 448, 449 n.1 (2015). "'Historical' CSLI refers to CSLI relating to and generated by cellular telephone use that has already occurred at the time of the order authorizing the disclosure of such data" (quotation and citation omitted). Id. In essence, "[t]he data can be used to approximate the location of a cellular telephone handset that was active at a particular time." Id.

[15] The warrant affidavit also noted that, on an unspecified date and with the same information, police sent an administrative subpoena to the defendant's cellular service provider, pursuant to G. L. c. 271, § 17B, seeking to obtain all the defendant's billing and call detail records for the one-month period leading up to the victim's death.

allowed the defendant's two motions to suppress his custodial statements, and denied the motions to suppress the identifications and the search of the cellular telephone. Both parties sought leave to pursue interlocutory appeals from those orders, and a single justice of this court allowed their petitions.

While these proceedings were underway, the defendant also filed a separate motion to suppress the CSLI. After a nonevidentiary hearing, the second motion judge denied the motion; a single justice of this court allowed the defendant's request to appeal from that order. The parties' cross appeals were consolidated in the Appeals Court, and we subsequently allowed the defendant's request for direct appellate review.

2. Discussion. "In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings absent clear error, but conduct an independent review of his [or her] ultimate findings and conclusions of law" (quotations and citation omitted). Jones-Pannell, 472 Mass. at 431. A reviewing court gives due deference to a motion judge's findings where, as here, the judge "has seen and heard the witnesses, and made determinations regarding the weight and credibility of their testimony." See Commonwealth v. Tremblay, 480 Mass. 645, 655 (2018), quoting Jones-Pannell, supra at 438. We may,

however, conduct an independent review of the documentary evidence.  See Tremblay, supra.

a.  Identifications.  The defendant contends that, because the witnesses harbored preconceived biases against him, and because police had those witnesses view a photograph and listen to an audio recording depicting the defendant, their subsequent visual identifications were inherently suggestive of him and violated due process and common-law principles of fairness.  To the extent that the defendant challenges the procedures employed by police to obtain a visual identification, we apply a due process analysis under art. 12 of the Massachusetts Declaration of Rights.  As to whether the witnesses' own biases and the unreliable nature of the video footage otherwise caused a suggestive confrontation with the defendant, we turn to common-law principles of fairness.

i.  Due process.  An out-of-court eyewitness identification conducted by police is inadmissible under art. 12 "if the defendant proves by a preponderance of the evidence that the identification was 'so unnecessarily suggestive and conducive to irreparable misidentification that its admission would deprive the defendant of his right to due process.'"  Commonwealth v. Johnson, 473 Mass. 594, 596-597 (2016), quoting Commonwealth v. Walker, 460 Mass. 590, 599 (2011).  "In considering whether identification testimony should be suppressed, the judge must

examine the totality of the circumstances attending the confrontation to determine whether it was unnecessarily suggestive" (quotation and citation omitted).  Johnson, supra at 597.  Where a defendant shows that the procedure utilized by police to obtain an identification was unnecessarily suggestive, "the out-of-court identification is per se excluded as a violation of the defendant's right to due process under art. 12."  Id., quoting Walker, supra at 599 n.13.  The purpose underlying the per se exclusionary rule in such circumstances is to deter any specter of police misconduct in obtaining an identification.  Johnson, supra at 597-598.

Insofar as the defendant challenges police conduct in the identification process, we agree with the first motion judge that the identification protocol devised and implemented by the detectives in this case was not so unnecessarily suggestive as to mandate per se exclusion under art. 12.[16]  Although an

---

[16] It is certainly not ideal that, prior to making an identification, each witness was apparently aware that the victim had been killed and suspected the defendant's involvement.  Nonetheless, we agree with the first motion judge's determination that the identification procedure was not unduly suggestive under the circumstances.  For example, police officers separated each witness during the identifications, presented the audio portion as distinct from the video portion, and did not allow the witnesses to see or hear the portion containing the gunshot.  Moreover, police themselves made no suggestion of the defendant's involvement, and no confirmatory feedback was provided to the witnesses.  See, e.g., Commonwealth v. Johnson, 473 Mass. 594, 600-602 (2016) (citing social science evidence and noting suggestive tactics police must avoid).

identification stemming from a videotape containing only one individual is analogous to a one-on-one identification, it raises due process concerns only if it is "unnecessarily suggestive of the defendant . . . so as to give rise to a very substantial likelihood of a mistaken identification" (citation omitted).  See Commonwealth v. Forte, 469 Mass. 469, 477 (2014).  Where there were no percipient witnesses to the shooting in this case, and where the victim's family members otherwise might have been in a position to ascertain the identity of the shooter from

---

Even so, where there is more than one potential identifying witness, and where it is feasible to do so, we caution that police should avoid affording those witnesses the opportunity to speak with other witnesses about their perceptions prior to the identification proceeding.  Of course, police cannot be expected to prevent every conceivable exposure to external information.  Precautions should be taken, however, to guard against the risk that a witness may be influenced by his or her conversations with police, family members, or other witnesses before making an identification.

Moreover, to the extent that the defendant complains of the photograph being shown to the witnesses before they made an identification, those witnesses already had suggested to police that the victim's boyfriend likely was involved.  Although it is better practice not to have shown a photograph of the defendant, police did so to confirm that this was the individual to whom the witnesses were referring when they spoke of the victim's boyfriend.  In these circumstances, given that the witnesses were familiar with the defendant and were not eyewitnesses to a crime, it is unlikely that the witnesses made an identification from the videotape based on their having viewed his photograph.  Compare Commonwealth v. Forte, 469 Mass. 469, 477 (2014) (suppression not required where percipient eyewitnesses later were shown surveillance footage and then identified defendant in photographic array as man whom they perceived at time of crime).

the surveillance footage, the police had good reason to have those witnesses attempt to do so.  Cf. id. ("good reason" to show surveillance tape and photograph where police needed prompt confirmation of investigatory information from witnesses).  The defendant does not suggest that police had an alternate identification procedure that they could have employed here but, rather, appears to imply that police should have forgone attempting to establish a visual identification altogether because the video quality was poor, the witnesses were biased against him, and they already had made an audio identification of his voice.[17]  We decline to disturb the judge's determination that the identification protocol utilized by police here does not mandate suppression under art. 12.

ii.  Common-law principles of fairness.  When an out-of-court identification is suggestive through no fault of the police, "suppression cannot deter police misconduct because

---

[17] The defendant does not appear to challenge the audio identifications in this appeal, but, to the extent that he may, we discern no abuse of discretion in the first motion judge's determination that those identifications need not be suppressed. The witnesses had significant familiarity with the defendant's and the victim's voices, both in person and over the telephone, such that the witnesses were able to identify the voices from the audio recording reliably.  Moreover, the police employed an appropriate procedure to separate the audio from the video segments, to ensure that the witnesses did not hear the gunshot, and to separate each witness while he or she attempted to make an identification.  See Commonwealth v. Chamberlin, 86 Mass. App. Ct. 705, 713 (2014).

there is none." See Johnson, 473 Mass. at 598. Nonetheless, if an identification arises from suggestive circumstances, "its admissibility 'should not turn on whether government agents had a hand in causing the confrontation,'" because the evidence is "equally unreliable in each instance." Id., quoting Commonwealth v. Jones, 423 Mass. 99, 109 (1996). Applying common-law principles of fairness, a judge accordingly may suppress the out-of-court eyewitness identification if it "resulted from a 'highly' or 'especially' suggestive confrontation with the defendant." See Johnson, supra at 598-599, quoting Jones, supra.

"Among our 'common law principles of fairness' is the evidentiary rule that a judge has discretion to exclude relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice.'" See Johnson, 473 Mass. at 599, quoting Commonwealth v. Crayton, 470 Mass. 228, 249 n.27 (2014). See also Johnson, supra ("A judge's authority to exclude severely unreliable identification testimony is closely related to his or her more general discretion to exclude evidence that is more prejudicial than probative" [quotation and citation omitted]). "A motion to suppress an identification under Jones is similar to a motion to suppress an identification under art. 12," but it differs in two key respects. See Johnson, supra. "First, the standard of admissibility is

different . . . ." Id. at 600. As opposed to the rule of per se exclusion, a judge maintains the discretion, after "weighing the probative value of the identification against the danger of unfair prejudice, and determining whether the latter substantially outweighs the former," to allow the admission of a suggestive identification or to exclude it. Id. at 600-602 (describing factors judge should consider in making such determination). Second, the standard of appellate review differs. Id. at 602. Under art. 12, we review without deference a motion judge's application of the law to the facts as found; under our common-law principles of fairness, however, we review for an abuse of discretion. Id.

In this regard, the defendant contends that the out-of-court identifications must be suppressed because the video footage is so inherently unreliable that no one could identify the defendant unless he or she were predisposed to do so. After hearing testimony from the three witnesses and from police, and after reviewing the video footage himself, however, the first motion judge rejected the notion that the witnesses' prior suspicions of the defendant's involvement, and their ability to ascertain his voice from the audio recording, precluded them from making a reliable visual identification.[18] Applying our

_____

[18] The defendant maintains that we should review the question de novo because the first motion judge did not apply

common-law principles of fairness, we discern no abuse of discretion in this determination.

Notably, the video quality in this case is poor, and likely would not permit an eyewitness who is unfamiliar with the suspect to make a visual identification from the recording. The individuals who made an identification here, however, were not eyewitnesses to a crime perpetrated by a stranger, who may be, perhaps, more susceptible to a mistaken identification given a "single" or "brief" exposure to a suspect in frightening conditions. See Commonwealth v. Chamberlin, 86 Mass. App. Ct. 705, 713 (2014). Rather, each witness had a long and close relationship with the defendant, and had considerable familiarity with his stature, gait, appearance, clothing, and features. See, e.g., id. (voice identifications rendered nonsuggestive given long-time association between witnesses and defendant); Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 328 (2000) (video identification admissible given officer's long social familiarity with defendant). When such familiarity is present, those witnesses may be able to discern identifying

---

common-law principles of fairness under Johnson, 473 Mass. at 602. Although the judge did not explicitly reference our common-law principles of fairness, he impliedly engaged in the requisite weighing of probative value and prejudicial effect in concluding that the identifications were reliable, relevant, and admissible. Having reviewed the video footage ourselves, we agree with the judge's determinations.

characteristics that others could not, rendering their visual identifications, in some circumstances, less unreliable. See Johnson, 473 Mass. at 601-602 ("witness's prior familiarity with the person identified, where that person is a witness's family member, friend, or long-time acquaintance," is relevant factor in assessing probative value of identification). Indeed, here, the three witnesses each immediately identified the defendant based on specifics such as his height, weight, and articles of clothing, and the way in which he moved. Given their familiarity with the defendant, and because their preconceived suspicions should not otherwise preclude them from being able to make a visual identification, we conclude that our common-law principles of fairness do not require suppression.[19]

b. Miranda warnings. The Commonwealth challenges the allowance of the motion to suppress custodial statements on the ground that the first motion judge erred in concluding that the Miranda warnings were inadequately conveyed.

_____

[19] Whether, and to what extent, the nonpercipient witnesses will be permitted to make an in-court identification or to testify as to what they could perceive in the video footage is a matter reserved to the trial judge. See Commonwealth v. Vacher, 469 Mass. 425, 441-442 (2014), quoting Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 326 (2000) (witness may only testify to identification if witness can add information that otherwise would be missing from jury's knowledge; otherwise, "it is the province of the jury to draw their own conclusions regarding the identity of the person depicted without the witness's assistance").

"In Miranda, the United States Supreme Court held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" Commonwealth v. Vuthy Seng, 436 Mass. 537, 543, cert. denied, 537 U.S. 942 (2002), quoting Arizona v. Miranda, 384 U.S. 436, 444 (1966).[20]  These procedural safeguards mandate that an accused must be warned that he or she "has a right to remain silent, that any statement he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed."  Vuthy Seng, supra, quoting Miranda, supra.  A defendant may waive these rights, provided that the waiver is made "voluntarily, knowingly, and intelligently" (citation omitted).  Vuthy Seng, supra.  The Commonwealth bears the burden of proving, beyond a reasonable doubt, that a defendant was advised of his or her rights in a meaningful way, and that he or she waived them in deciding to make a statement to police.  Id. at 544.  See Commonwealth v. Bins, 465 Mass. 348, 358 (2013). Whether a defendant was given adequate Miranda warnings is a

_____

[20] It is undisputed that the defendant was in custody for Miranda purposes.  See Commonwealth v. Clemente, 452 Mass. 295, 327-328 (2008), cert. denied, 555 U.S. 1181 (2009).

question of law that we review de novo.[21]  See Vuthy Seng, supra
at 543.

The first motion judge heard expert testimony on the
defendant's lack of English-language proficiency, and his tested
inability to comprehend most of the words contained in the
Miranda warnings.[22]  The judge also was provided a videotape of
the interrogation and a formal transcript of the translated
warnings prepared by a certified interpreter.  After hearing the
expert testimony and reviewing the record, the judge made
findings that the defendant was able to "understand 'street
English'" and some basic words, but was unable to follow a
conversation between two English speakers, and was unable to
understand statements involving complex technical concepts, such
as warrants and criminal procedure rights.  The judge concluded
that the defendant's rights were conveyed "in such a fragmented
and confusing manner so as to be incoherent" in his native
language, and the defendant did not otherwise understand the

---

[21] The first motion judge considered the transcript and
videotape of the interrogation in light of expert testimony.
Where a judge made credibility determinations as to a witness's
testimony that were relevant to his or her subsidiary findings
of fact, we adhere to the ordinary standard of review and afford
deference to the judge's findings.  See Commonwealth v.
Tremblay, 480 Mass. 645, 655 (2018); Commonwealth v. Clarke, 461
Mass. 336, 341 (2012).

[22] The expert testified that the defendant understood only
one of nine critical words in the Miranda warnings.

English version of the warnings. The judge accordingly suppressed the custodial statements that followed.

We agree that the defendant was not adequately informed of his rights in Spanish in several key respects. First, the defendant was not apprised that anything he said could be used against him in court. "As we have stated: 'The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court.'" See Vuthy Seng, 436 Mass. at 544, quoting Miranda, 384 U.S. at 469. The warning is "an absolute prerequisite to interrogation," and is necessary in order to make the accused aware "not only of the privilege, but also of the consequences of forgoing it." See Vuthy Seng, supra, quoting Miranda, supra at 469, 471.

Here, those consequences were conveyed to the defendant as "[a]ny thing that you say can be against you . . . the, of the court," which, as the Commonwealth concedes, is problematic at best.[23] Indeed, we do not view this translation as a minor variation in interpretation, see Bins, 465 Mass. at 358-359, but, rather, as a deficiency that wholly interfered with the full, accurate, and effective recitation of the defendant's Miranda rights. See Commonwealth v. Dagraca, 447 Mass. 546, 552

---

[23] The defendant also was not asked, either in Spanish or in English, whether he understood this right.

(2006) (requiring suppression where police did not advise defendant that anything he said could be used against him in court); Vuthy Seng, 436 Mass. at 544 (same). Contrast Commonwealth v. Perez, 411 Mass. 249, 255 (1991) ("slight ambiguities in a few of the Spanish words on the [Miranda] cards, the use of one colloquial Spanish term, and the lack of accent marks" did not interfere with meaning of warnings).

There were similar defects in the translation of other warnings. For example, the defendant was informed that if he did not have the means to pay for an attorney, and if he "wish[ed] for it," that he had the right "to be a law, lawyer before being interrogated." Cf. Vuthy Seng, 436 Mass. at 544-545 (telling defendant that if he could not afford attorney, "they can help find one for you" was inadequate); Commonwealth v. Colby, 422 Mass. 414, 418 (1996) (telling defendant that "if he could not afford an attorney, the Commonwealth would attempt to provide one for him" was inadequate).

The Commonwealth contends that, notwithstanding these deficiencies, the totality of the circumstances otherwise suggests that the defendant understood his rights; he "nodded" throughout the interview and demonstrably could understand some words, such as "lawyer," which he supplied in Spanish when the interpreting officer was struggling to find the word. Based on expert testimony on the coping mechanisms of non-native

speakers, however, the first motion judge ascribed the defendant's nodding along as an indication that he was attempting to listen to the officer, and not as proof beyond a reasonable doubt that he understood the warnings. The judge also determined that the defendant's ability to understand basic English words did not equate to an ability to comprehend them when used as technical concepts within complex sentences, particularly where the defendant did not understand other words in the sentence, and where they involved a fragmented recitation of his constitutional rights.

Although we have recognized that the translation of Miranda warnings into a defendant's native language need not be "word for word," see Commonwealth v. The Ngoc Tran, 471 Mass. 179, 186 (2015), the translation cannot be so "misstated to the point of being contradictory" or equivocal. See Bins, 465 Mass. at 363. Here, the Spanish recitation of several required warnings was incapable of conveying "meaningful advice to the unlettered and unlearned in language which [a defendant] can comprehend and on which [a defendant] can knowingly act" (citation omitted). See Vuthy Seng, 436 Mass. at 544. As such, we conclude that the defendant was unable to execute a knowing, intelligent, and voluntary waiver of his rights, and the custodial statements obtained thereafter properly were suppressed.

c. <u>Search of the cellular telephone</u>. Because the request to search the defendant's cellular telephone directly followed the failure to provide him with adequate Miranda warnings, and was derived from statements he made during the interrogation, the defendant contends that the search was presumptively invalid and the fruits obtained from it should have been suppressed. The Commonwealth concedes that if the court concludes that the warnings were inadequate, the cellular telephone evidence must be suppressed. We agree as well.

Pursuant to art. 12, any physical or testimonial evidence that is "derived from unwarned statements where Miranda warnings would have been required . . . in order for them to be admissible, is presumptively excludable from evidence at trial as 'fruit' of the improper failure to provide such warnings." <u>Commonwealth</u> v. <u>Martin</u>, 444 Mass. 213, 215 (2005). See <u>Commonwealth</u> v. <u>Simon</u>, 456 Mass. 280, 292, cert. denied, 562 U.S. 874 (2010).[24] In order for evidence obtained following an

---

[24] Although the United States Constitution permits the prosecution to introduce the physical fruits of a voluntary but unwarned statement to police, see <u>United States</u> v. <u>Patane</u>, 542 U.S. 630, 637-640 (2004), we have concluded that the broader protections of art. 12 of the Massachusetts Declaration of Rights bar the use of physical and testimonial fruits derived from an unwarned statement. See <u>Commonwealth</u> v. <u>Simon</u>, 456 Mass. 280, 292, cert. denied, 562 U.S. 874 (2010), citing <u>Commonwealth</u> v. <u>Martin</u>, 444 Mass. 213, 218-219 (2005). Other States similarly have adopted broader protections under their State Constitutions. See, e.g., <u>State</u> v. <u>Farris</u>, 2006-Ohio-3255, ¶¶ 46-49, cert. denied, 549 U.S. 1252 (2007); <u>State</u> v.

unwarned statement to be admissible, the Commonwealth must show that it is "sufficiently attenuated" from the unwarned statement itself. See Commonwealth v. Tuschall, 476 Mass. 581, 589 (2017). To determine whether there was sufficient attenuation, a court considers such factors as the temporal proximity, whether there were any intervening circumstances, and the flagrancy of the official misconduct. Id. See Commonwealth v. Long, 476 Mass. 526, 536-537 (2017). In assessing those factors, "[w]e do not apply a 'but for' test," Long, supra at 536, but, rather, we consider whether the evidence came about as a result of the "exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 537, quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963).

The request to search the defendant's cellular telephone here was not so attenuated; the search arose directly from the defendant's unwarned statements, and the Commonwealth does not suggest that it has met its burden of proving that the taint was dissipated through some other intervening circumstance. Compare Martin, 444 Mass. at 220. Further, while the degree of official misconduct here was not egregious, the inadequate translation of Miranda warnings and of the interrogation itself makes plain the

Vondehn, 348 Or. 462, 475-476 (2010); State v. Peterson, 2007 VT 24, ¶ 28; State v. Knapp, 2005 WI 127, ¶¶ 73-83.

ongoing "need for law enforcement to use capable, trained translators who will report verbatim the question asked and the response given," as well as to use interpreters who are able meaningfully to convey the substance of a suspect's Miranda rights. See Commonwealth v. Santana, 477 Mass. 610, 618 n.6 (2017). The fruits obtained from the search thus require suppression.

d. Search of the CSLI. Police filed an application for a search warrant, supported by an affidavit, in order to obtain thirty-two days of the defendant's CSLI, spanning the period of time from December 5, 2014, to January 5, 2015.[25] Following the issuance of the search warrant, the defendant moved to suppress the CSLI. The motion was denied.

On appeal, the defendant argues that the affidavit filed in support of the Commonwealth's application did not establish the requisite probable cause to obtain a search warrant. The Commonwealth concedes that if the Miranda warnings were inadequate, the affidavit relied on tainted information obtained as a result of the invalid search, including the defendant's telephone number. The Commonwealth contends, however, that when

---

[25] Police initially sent an administrative subpoena to the defendant's cellular service provider, pursuant to 18 U.S.C. § 2703, to obtain subscriber information and telephone call logs for the same period. The subpoena did not include a request for CSLI.

the tainted information is excised from the affidavit, sufficient probable cause remained to obtain CSLI for the defendant's movements during the roughly month-long period.

Whether a search warrant is supported by probable cause "is a question of law that we review de novo." Perkins, 478 Mass. at 102. Our review is limited to the four corners of the affidavit, and any reasonable inferences drawn therefrom. Id. A search warrant application for CSLI must demonstrate (1) "probable cause to believe that a particularly described offense has been . . . committed" and (2) "that the CSLI sought will 'produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed . . . such offense.'"[26] See Commonwealth v. Augustine, 467 Mass. 230, 236 n.15 (2014), S.C., 470 Mass. 837 and 472 Mass. 448 (2015), quoting Commonwealth v. Connolly, 454 Mass. 808, 825 (2009). In this regard, the government must be able to demonstrate "a sufficient nexus between the criminal activity for which probable cause has been established and the physical location of the [cellular telephone] recorded by the

---

[26] "This test requires a higher degree of confidence that the CSLI will yield evidence of criminal activity than that which is necessary for an order under [18 U.S.C.] § 2703(d), which requires only that the government show specific and articulable facts that the CSLI is relevant and material to an ongoing criminal investigation" (quotations and citation omitted). See Augustine, 472 Mass. at 455.

CSLI of the person the applicant has probable cause to believe has committed the offense, at least at the time and place of the criminal activity." See Commonwealth v. Hobbs, 482 Mass. 538, 547 (2019). To establish the requisite nexus, the affidavit must set forth "a substantial basis to conclude that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues" (quotation and citation omitted). Id. at 546. See Augustine, 472 Mass. at 455. Such a determination is fact-intensive and will be resolved on a case-by-case basis. See Commonwealth v. Holley, 478 Mass. 508, 522 (2017).

There is no dispute here that the Commonwealth established probable cause to believe that a particularly described offense had been committed. See Augustine, 467 Mass. at 236 n.15. Whether the Commonwealth demonstrated probable cause to establish the requisite nexus between the commission of that crime and the CSLI for the defendant's device, however, is another matter.

Ordinarily, police may be able to demonstrate the requisite nexus by connecting the defendant to ownership of a particular device and by showing a substantial basis that the device will contain relevant evidence of the crime -- that is, the defendant's location at or around the time the crime was

committed. See Hobbs, 482 Mass. at 546-549; Commonwealth v. Alexis, 481 Mass. 91, 102 (2018). Here, however, when we remove from the calculus any tainted evidence contained within the affidavit in support of the application for a search warrant, such as the defendant's disclosure of his telephone number, the Commonwealth has not met its burden with regard to establishing any such nexus. Compare Hobbs, supra at 548-549 (that defendant's telephone number was known to police and corroborated by multiple individuals established defendant's association with sought-after device's CSLI).

Nor has the Commonwealth demonstrated any connection between the commission of the crime and the thirty-two days for which the Commonwealth sought the CSLI. Indeed, there is nothing in the affidavit that might suggest that the location of the defendant's telephone, beyond the night of the shooting itself, would produce any evidence of the crime. Compare Hobbs, 482 Mass. at 547-548 (affidavit must show that sought-after CSLI would produce evidence of crime -- namely, defendant's presence at or around crime scene at time of crime); Commonwealth v. Estabrook, 472 Mass. 852, 870 (2015) (affidavit must indicate "whether [defendant's] cellular telephone . . . was located near the victim's home on the night of the shooting and, therefore whether [defendant] was in the area of the shooting when it occurred" (emphasis added)). "We once again emphasize the

significant constitutional issues raised by the collection of extended amounts of historical CSLI, and the importance of limiting the requests accordingly."  Hobbs, supra at 550 n.13, citing Augustine, 467 Mass. at 248-249.

As such, the information contained within the four corners of the affidavit does not support a determination of probable cause, and the CSLI obtained as a result must be suppressed.[27]

3.  Conclusion.  That portion of the order allowing the defendant's motions to suppress his custodial statements is affirmed.  The denial of the motion to suppress the out-of-court identifications is affirmed.  So much of the orders as deny the motions to suppress evidence obtained from a search of the defendant's cellular telephone and the CSLI are reversed.

So ordered.

---

[27] "Even though the exclusionary rule generally bars from admission evidence 'obtained during an illegal search as fruit of the poisonous tree, evidence initially discovered as a consequence of an unlawful search may be admissible if later acquired independently by lawful means untainted by the initial illegality'" (citation omitted). Commonwealth v. Estabrook, 472 Mass. 852, 865 (2015).  If the Commonwealth can show, by a preponderance of the evidence, that it has an untainted source for the telephone number, connecting the defendant to the ownership of the device for which the CSLI is requested, it is not precluded from doing so.  Id. at 865, 870-871 (suppression not required where police applied for search warrant for CSLI based on information wholly independent of unlawfully obtained CSLI).